No. 24-2882

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

---

EPIC SYSTEMS CORPORATION,
*Plaintiff-Appellant,*

v.

TATA CONSULTANCY SERVICES LIMITED & TATA AMERICA
INTERNATIONAL CORPORATION (dba TCS AMERICA),
*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Western District of Wisconsin, No. 3:14-cv-00748-wmc (Conley, J.)

---

**BRIEF AND REQUIRED SHORT APPENDIX
OF PLAINTIFF-APPELLANT EPIC SYSTEMS CORPORATION**

---

Michael T. Brody
  *Counsel of Record*
Simon A. de Carvalho
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
(312) 222-9350
mbrody@jenner.com
sdecarvalho@jenner.com

Kathryn L. Wynbrandt
JENNER & BLOCK LLP
1099 New York Avenue NW,
  Suite 900
Washington, DC 20001
(202) 639-6000
kwynbrandt@jenner.com

Kristin G. Noel
QUARLES & BRADY LLP
33 East Main Street,
  Suite 900
Madison, WI 53703
(608) 251-5000
kristin.noel@quarles.com

*Attorneys for Plaintiff-Appellant Epic Systems Corporation*

ORAL ARGUMENT REQUESTED

<u>CIRCUIT RULE 26.1 DISCLOSURE STATEMENT</u>

Appellate Court No. <u>24-2882</u>

Short Caption: <u>Epic Systems Corporation v. Tata Consultancy Services Limited, et al.</u>

      To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

      The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[x]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    <u>Epic Systems Corporation</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the District Court or before an administrative agency) or are expected to appear for the party in this court:

    <u>Jenner & Block LLP; Quarles & Brady LLP</u>

(3)    If the party or amicus is a corporation:

    i)    Identify all of its parent corporations, if any; and
    <u>None</u>

    ii)    list any publicly held company that owns 10% or more of the party's or amicus' stock:
    <u>None</u>

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases: <u>N/A</u>

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2: <u>N/A</u>

Attorney's Signature <u>_s/ Michael T. Brody</u>    Date: <u>January 13, 2025 (new)</u>

Attorney's Printed Name: <u>Michael T. Brody</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** <u> X </u>
    **No** <u>    </u>

Address:    <u>Jenner & Block LLP, 353 North Clark Street</u>
    <u>Chicago, IL 60654</u>

Phone Number: <u>(312) 923-2711</u>    Fax Number: <u>(312) 527-0484</u>

E-Mail Address: <u>mbrody@jenner.com</u>

rev. 12/19 AK

<u>CIRCUIT RULE 26.1 DISCLOSURE STATEMENT</u>

Appellate Court No. <u> 24-2882 </u>

Short Caption: <u> Epic Systems Corporation v. Tata Consultancy Services Limited, et al. </u>

     To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

     The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    **[x]**    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    <u> Epic Systems Corporation </u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the District Court or before an administrative agency) or are expected to appear for the party in this court:

    <u> Jenner & Block LLP; Quarles & Brady LLP </u>

(3)    If the party or amicus is a corporation:

    i)    Identify all of its parent corporations, if any; and
    <u> None </u>

    ii)    list any publicly held company that owns 10% or more of the party's or amicus' stock:
    <u> None </u>

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases: <u> N/A </u>

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2: <u> N/A </u>

Attorney's Signature <u> s/ Kathryn L. Wynbrandt </u>    Date: <u> January 13, 2025 (new) </u>

Attorney's Printed Name: <u> Kathryn L. Wynbrandt </u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** <u>   </u>
    **No** <u>  X </u>

Address:    <u> Jenner & Block LLP 1099 New York Avenue NW, Suite 900 </u>
    <u> Washington DC 20001 </u>

Phone Number: <u> (202) 637-6389 </u>    Fax Number: <u> (202) 639-6066 (new) </u>

E-Mail Address: <u> kwynbrandt@jenner.com </u>

rev. 12/19 AK

<u>CIRCUIT RULE 26.1 DISCLOSURE STATEMENT</u>

Appellate Court No. <u>24-2882</u>

Short Caption: <u>Epic Systems Corporation v. Tata Consultancy Services Limited, et al.</u>

      To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

      The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    **[x]**    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    <u>Epic Systems Corporation</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the District Court or before an administrative agency) or are expected to appear for the party in this court:

    <u>Jenner & Block LLP; Quarles & Brady LLP</u>

(3)    If the party or amicus is a corporation:

    i)    Identify all of its parent corporations, if any; and
        <u>None</u>

    ii)    list any publicly held company that owns 10% or more of the party's or amicus' stock:
        <u>None</u>

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases: <u>N/A</u>

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2: <u>N/A</u>

Attorney's Signature <u>s/ Simon de Carvalho</u>    Date: <u>January 13, 2025 (new)</u>

Attorney's Printed Name: <u>Simon de Carvalho</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes**  <u>   </u>
                                                          **No**  <u>  X  </u>

Address:    <u>Jenner & Block LLP 353 North Clark Street</u>
            <u>Chicago, IL 60654</u>

Phone Number: <u>(312) 840-7204</u>    Fax Number: <u>(312) 527-0484</u>

E-Mail Address: <u>sdecarvalho@jenner.com</u>

rev. 12/19 AK

<u>CIRCUIT RULE 26.1 DISCLOSURE STATEMENT</u>

Appellate Court No. <u>24-2882</u>

Short Caption: <u>  Epic Systems Corporation v. Tata Consultancy Services Limited, et al.</u>

  To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

  The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[ ]  PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

  <u>Epic Systems Corporation</u>

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the District Court or before an administrative agency) or are expected to appear for the party in this court:

  <u>Jenner & Block LLP; Quarles & Brady LLP</u>

(3)  If the party or amicus is a corporation:

  i)  Identify all of its parent corporations, if any; and
    <u>None</u>

  ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:
    <u>None</u>

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases: <u>N/A</u>

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2: <u>N/A</u>

Attorney's Signature <u>  s/Kristin Graham Noel</u>   Date: <u>  January 13, 2025</u>

Attorney's Printed Name: <u>  Kristin Graham Noel</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** <u>        </u>
                               **No** <u>    X    </u>

Address:   <u>Quarles & Brady LLP 33 East Main Street, Suite 900</u>
     <u>Madison, WI 53703</u>

Phone Number: <u>  (608) 251-5000</u>    Fax Number: <u>    (608) 251-9166</u>

E-Mail Address: <u>  kristin.noel@quarles.com</u>

rev. 12/19 AK

## TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENTS ........................................................... i

TABLE OF AUTHORITIES ................................................................vii

INTRODUCTION.................................................................................... 1

JURISDICTIONAL STATEMENT....................................................... 3

ISSUE PRESENTED FOR REVIEW ................................................... 5

STATEMENT OF THE CASE ............................................................... 5

    A. The Dispute Between Epic and TCS ....................................... 5

    B. The Jury's Verdicts and TCS's Post-Trial Motions.................. 6

    C. The 2017 Judgment and TCS's Post-Judgment Motion ......... 9

    D. *Epic I* ...................................................................................... 9

    E. Proceedings on Remand From *Epic I* ................................... 12

    F. *Epic II* .................................................................................. 13

    G. Proceedings on Remand From *Epic II* ................................. 14

STANDARD OF REVIEW ............................................................... 16

SUMMARY OF ARGUMENT .......................................................... 16

ARGUMENT ..................................................................................... 19

I. POST-JUDGMENT INTEREST UNDER SECTION 1961(a) RUNS FROM THE ENTRY OF THE JUDGMENT ESTABLISHING THE LEGAL AND FACTUAL BASES FOR THE PLAINTIFF'S ENTITLEMENT TO DAMAGES ... 19

    A. Tools for Interpreting Section 1961(a) Direct That Interest Begins to Accrue Upon the District Court's Entry of the Judgment Establishing the Legal and Factual Bases for the Plaintiff's Entitlement to Damages ................................................................... 20

        1. Legal Dictionaries Demonstrate That a Money Judgment Is Recovered When the Plaintiff's Entitlement to Damages Is Established...................................................................... 21

2. Pre-Enactment Precedent Instructs That Courts Deciding Whether Subsequent Proceedings Affect When a Judgment Was "Recovered" Must Look to Whether the Judgment Was Affirmed in "Substance" Rather Than in "Form." ........................................... 23

3. Section 1961(a)'s Purpose Confirms These Conclusions.................. 25

B. Cases Applying Section 1961(a) Confirm That, Once the Plaintiff's Entitlement to Collect Damages Is Established as a Matter of Fact and Law, Subsequent Developments That Only Reduce the Amount of Damages Do Not Restart the Clock.................................................... 26

1. Vacatur of a Judgment on Grounds That Leave the Bases for the Plaintiff's Damages Award Undisturbed Does Not Restart the Clock Under Section 1961(a) ..................................................... 27

2. Interest Does Not Accrue on a Judgment Based on Legally Insufficient Facts or an Erroneous Legal Theory............................. 30

3. This Court's Decisions Adhere to These Principles........................... 32

II. EPIC IS ENTITLED TO RECEIVE POST-JUDGMENT INTEREST FROM THE DATE OF THE ORIGINAL JUDGMENT ............................................ 35

A. Because *Epic I* Left Intact the Factual and Legal Bases of the Jury's Award, the District Court Erred in Concluding That Later Proceedings Altered the Relevant Date Under Section 1961(a) .............. 36

1. *Epic I* Affirmed Epic's Legal Entitlement to Collect Punitive Damages and Did Not Question the Jury's Factual Findings ........... 36

2. Neither *Epic I*'s Application of a Constitutional Limit on the Amount of Punitive Damages Nor Its Vacatur and Remand to the District Court Restarted the Clock Under Section 1961(a).......... 38

a. The Court's Holding in *Epic I* That the Due Process Clause Capped Punitive Damages Did Not Affect Epic's Entitlement to Collect Interest From the Date of the Original Judgment......... 39

b. The District Court Erred in Holding That *Epic I*'s Decision to Vacate and Remand Changed the Relevant Judgment for Purposes of Section 1961(a)...................................................... 41

B. A Contrary Result Would Award TCS a Windfall, Undermining the Purpose of Section 1961(a)................................................................... 46

CONCLUSION ........................................................................... 49

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Art Midwest, Inc. v. Clapper*,
   805 F.3d 611 (5th Cir. 2015) ................................................................. 16

*Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*,
   917 F.2d 1413 (6th Cir. 1990) ............................................................... 31

*Ashland Oil, Inc. v. Phillips Petroleum Co.*,
   607 F.2d 335 (10th Cir. 1979) (per curiam),
   *cert. denied*, 446 U.S. 936 (1980) ......................................................... 31

*Bevis v. City of Naperville*,
   85 F.4th 1175 (7th Cir. 2023),
   *cert. denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024) .................. 21

*BMW of North America, Inc. v. Gore*,
   517 U.S. 559 (1996) ............................................................................. 8

*Buckhannon Board & Care Home, Inc. v. West Virginia Department
   of Health & Human Resources*,
   532 U.S. 598 (2001) ............................................................................ 21

*Centerpoint Energy Services, Inc. v. Halim*,
   743 F.3d 503 (7th Cir. 2014) ................................................................. 16

*Coal Resources, Inc. v. Gulf & Western Industries, Inc.*,
   954 F.2d 1263 (6th Cir. 1992) ......................................................... 27, 42

*Consumer Financial Protection Bureau v. Townstone Financial, Inc.*,
   107 F.4th 768 (7th Cir. 2024) ............................................................... 19

*Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*,
   532 U.S. 424 (2001) ....................................................................... 40, 47

*Cordero v. De Jesus-Mendez*,
   922 F.2d 11 (1st Cir. 1990)................................................... 14, 32, 35, 38

*Corner Post, Inc. v. Board of Governors of Federal Reserve System*,
   603 U.S. 799 (2024) ............................................................................ 21

*Dimick v. Schiedt*,
   293 U.S. 474 (1935) ..................................................... 18, 40, 41, 46

*Divane v. Krull Electric Co.,*
  319 F.3d 307 (7th Cir. 2003) ........................... 15, 32, 33, 34, 35, 44, 45, 46

*Divane v. Krull Electric Co., Inc.,*
  200 F.3d 1020 (7th Cir. 1999) .................................................................. 32

*Dunn v. HOVIC,*
  13 F.3d 58 (3d Cir. 1993) ...........................................27, 28, 42, 43, 45, 47

*Exxon Valdez v. Exxon Mobil,*
  568 F.3d 1077 (9th Cir. 2009) ............. 15, 26, 27, 28, 29, 34, 37, 38, 42, 45

*George v. McDonough,*
  596 U.S. 740 (2022) .......................................................................... 20, 25

*Harris v. Chicago Great Western Railway Co.,*
  197 F.2d 829 (7th Cir. 1952) ...................................................15, 34, 35, 45

*Hysell v. Iowa Public Service Co.,*
  559 F.2d 468 (8th Cir. 1977) .................................................................... 31

*Johansen v. Combustion Engineering, Inc.,*
  170 F.3d 1320 (11th Cir. 1999) ....................................................... *passim*

*Kaiser Aluminum & Chemical Corp. v. Bonjorno,*
  494 U.S. 827 (1990) .................................... 2, 14, 16, 18, 25, 26, 30, 47, 48

*Kneeland v. American Loan & Trust Co.,*
  138 U.S. 509 (1891) ........................................................................ *passim*

*Kneeland v. American Loan & Trust Co.,*
  136 U.S. 89 (1890) ........................................................................... 23, 24

*Lewis v. Whelan,*
  99 F.3d 542 (2d Cir. 1996) .............................. 18, 30, 31, 33, 35, 42, 43, 45

*Merck & Co., Inc. v. Reynolds,*
  559 U.S. 633 (2010) ................................................................................ 21

*Merit Insurance Co. v. Leatherby Insurance Co.,*
  728 F.2d 943 (7th Cir. 1984) ................................2, 3, 16-17, 18, 25, 26, 47

*Motorola Solutions, Inc. v. Hytera Communications Corp. Ltd.,*
  108 F.4th 458 (7th Cir. 2024) .................................................................. 19

*National Credit Union Administration Board v. Nomura Home Equity
  Loan, Inc.,* 764 F.3d 1199 (10th Cir. 2014),
  *cert. denied,* 574 U.S. 1074 (2015)........................................................... 21

*Northern Natural Gas Co. v. Hegler*,
818 F.2d 730 (10th Cir. 1987) ........................................................ 27, 42

*Perkins v. Standard Oil Co. of California*,
487 F.2d 672 (9th Cir. 1973) ................................................................ 48

*Pulsifer v. United States*,
601 U.S. 124 (2024) ............................................................................. 19

*Radford Trust v. First Unum Life Insurance Co. of America*,
491 F.3d 21 (1st Cir. 2007)................................................................... 16

*Saccameno v. U.S. Bank National Ass'n*,
943 F.3d 1071 (7th Cir. 2019) ........................................................ 40, 43

*Smith v. Spizzirri*,
601 U.S. 472 (2024) ............................................................................. 19

*Tinsley v. Sea-Land Corp.*,
979 F.2d 1382 (9th Cir. 1992) (per curiam)...................................... 27, 42

*United States v. Chaoqun*,
107 F.4th 715 (7th Cir. 2024) .............................................................. 19

*United States v. Hansen*,
599 U.S. 762 (2023) ............................................................................. 20

*Westinghouse Credit Corp. v. D'Urso*,
371 F.3d 96 (2d Cir. 2004) ................................................................... 16

*Wheeler v. John Deere Co.*,
935 F.2d 1090 (10th Cir. 1991) ....................................................... 30-31

*Yates v. United States*,
574 U.S. 528 (2015) ............................................................................. 19

**Statutes and Rules**

15 U.S.C. § 1................................................................................................ 3

15 U.S.C. § 2................................................................................................ 3

18 U.S.C. § 1030...................................................................................... 3, 6

28 U.S.C. § 1291.......................................................................................... 4

28 U.S.C. § 1331.......................................................................................... 3

28 U.S.C. § 1332 ................................................................ 3, 4

28 U.S.C. § 1332(a) ............................................................... 4

28 U.S.C. § 1367 ................................................................ 3, 4

28 U.S.C. § 1961 .................................................................. 4

28 U.S.C. § 1961(a) ................................. 17, 18, 20, 22, 25, 26, 30, 31, 36, 40

Act of Aug. 23, 1842, ch. 188, § 8, 5 Stat. 516, 518 ....................... 23

Act of June 26, 1948, ch. 125, § 1961, 62 Stat. 869, 957-58 ........................ 21

Rev. Stat. § 966, 1 Rev. Stat. 182 (1875) ...................................... 23

Rev. Stat. § 966, 2 Rev. Stat. 182 (1878) ...................................... 23

7th Cir. R. 40(e) ............................................................. 42

## Other Authorities

*Judgment,*

　　Ballentine's Law Dictionary (2d ed. 1948) ................................ 22

　　Black's Law Dictionary (3d ed. 1933) ................................ 22, 30

　　Black's Law Dictionary (4th ed. 1951) ..................................... 22

*Money Judgment,*

　　Ballentine's Law Dictionary (2d ed. 1948) ................................ 22

　　Black's Law Dictionary (3d ed. 1933) ...................................... 22

　　Black's Law Dictionary (4th ed. 1951) ..................................... 22

*Recover,*

　　Ballentine's Law Dictionary (2d ed. 1948) ................................ 22

　　Black's Law Dictionary (4th ed. 1951) .............................22, 25, 26

## INTRODUCTION

Nearly a decade ago, a jury found that TCS violated Epic's[1] rights under federal and state law when, over several years, it "stole thousands of Epic's documents, lied about it, covered it up, and used Epic's information in a variety of ways." *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.* (*Epic I*), 980 F.3d 1117, 1140 (7th Cir. 2020). For this "repeated and brazen misconduct," the jury awarded Epic both compensatory and punitive damages. *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.* (*Epic II*), No. 22-2420, 2023 WL 4542011, at *3 (7th Cir. July 14, 2023). The district court entered judgment on October 3, 2017. R.978, A12-17.[2]

Since then, Epic's entitlement to damages has been repeatedly vindicated. As relevant here, this Court held in *Epic I* that TCS's conduct "warrant[ed] punishment" and that Epic was entitled to collect punitive damages under Wisconsin law. 980 F.3d at 1137-42. But it deemed the punitive-damages award—$280 million against compensatory damages of $140 million—constitutionally excessive, holding that "the maximum permissible award of punitive damages in this case is $140 million." *Id.* at 1145. The Court remanded

---

[1] Plaintiff-Appellant Epic Systems Corporation ("Epic") refers to Defendants-Appellees Tata Consultancy Services Limited and Tata America International Corporation (dba TCS America) collectively as "TCS."

[2] Citations to "R._" are to the district court docket, No. 14-cv-00748 (W.D. Wis.). Citations to "A_" are to the required short appendix attached to this brief. Citations to "*Epic I* Dkt._" are to this Court's docket in the first appeal, Nos. 19-1528 & 19-1613 (consol.) (7th Cir.).

for the district court to enter an amended judgment eliminating the constitutionally excessive portion of the award. *Id.* at 1146. In July 2022, the district court "did precisely that," reducing punitive damages to $140 million. *Epic II*, 2023 WL 4542011, at *2. This Court affirmed. *See id.* at *2-3.

Under 28 U.S.C. § 1961(a), TCS owes Epic post-judgment interest on the $140 million punitive-damages award until it was paid in 2023. The question in this appeal is whether post-judgment interest began to accrue when the district court entered judgment on the jury's verdict in October 2017, or only when it entered an amended judgment in July 2022 eliminating the constitutionally excessive portion of the punitive-damages award.

The answer is that Epic's entitlement to post-judgment interest runs from the original 2017 judgment. From that point forward, Epic remained the "successful plaintiff," *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835-36 (1990) (quotation omitted), "whose position on the merits [was] vindicated," and TCS remained the "adjudicated wrongdoer," *Merit Ins. Co. v. Leatherby Ins. Co.*, 728 F.2d 943, 945 (7th Cir. 1984). While subsequent proceedings reduced the amount of punitive damages, they did not undermine the factual or legal basis for Epic's entitlement to the damages Epic ultimately collected. Accordingly, the original punitive-damages judgment was "correct to the extent of" the $140 million that TCS paid in 2023, meaning that post-judgment interest on that $140 million began to accrue when the original judgment was entered. *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1340 (11th Cir. 1999).

Every circuit faced with this fact pattern—where a punitive-damages award was vacated as excessive and subsequently reduced—has concluded that post-judgment interest runs from the original judgment under Section 1961(a). And every circuit faced with similar fact patterns—where the factual and legal bases for a plaintiff's entitlement to damages were affirmed, even where the judgment itself was vacated—has reached the same conclusion.

But not the district court here. In the decision below, the district court erred in concluding that post-judgment interest did not begin to accrue until the amended judgment was entered in 2022. The district court's ruling is unsupported by the text of Section 1961(a). There is no precedent, in this Court or any other, requiring this result. And the district court's ruling cuts directly against the statute's purpose by awarding TCS a windfall, allowing it to "enjoy, interest free" for five years, $140 million "that rightfully belonged to [Epic]" all along. *Merit Ins.*, 728 F.2d at 945. This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1332, and 1367. *See Epic I*, 980 F.3d at 1128. Both Epic, in its operative complaint, R.290, and TCS, in its counterclaims, R.295, R.296, asserted claims under federal statutes over which the district court had jurisdiction pursuant to 28 U.S.C. § 1331.[3] Each party likewise alleged

---

[3] Epic alleged violations of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030. *See* R.290 ¶¶ 70-74. TCS brought counterclaims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. *See* R.296 ¶¶ 181-198.

violations of Wisconsin state law over which the district court had supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because those claims were so related to the parties' federal-law claims that they formed part of the same case or controversy.[4]   The district court also had subject-matter jurisdiction over all claims and counterclaims pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the dispute arises between citizens of different states (and a citizen of a foreign state).[5]

On remand from this Court's decision in *Epic II*, Epic was entitled to collect punitive damages of $140,000,000, plus post-judgment interest under 28 U.S.C. § 1961(a).  After TCS paid the punitive-damages award, the only issue remaining was the date from which post-judgment interest should begin to run.

On September 23, 2024, the district court, agreeing with TCS, held that post-judgment interest ran from the date of entry of the amended judgment. R.1065, A1-9.  That opinion and order adjudicated all remaining claims and the rights and obligations of all remaining parties in the case.  Epic filed a timely notice of appeal on October 22, 2024.  R.1066.  This Court accordingly has jurisdiction pursuant to 28 U.S.C. § 1291.

---

[4] *See* R.290 ¶¶ 75-140 (Epic's state-law claims); R.296 ¶¶ 199-244 (TCS's state-law counterclaims).

[5] Epic, a Wisconsin corporation with its principal place of business in Verona, Wisconsin, is a citizen of Wisconsin for purposes of Section 1332(a).  R.290 ¶ 8. Tata America International Corporation (dba TCS America), a New York corporation with its principal place of business in New York, New York, is a citizen of New York.  R.295 ¶¶ 11, 30.  Tata Consultancy Services Limited, an Indian company with a principal place of business in Mumbai, India, is a citizen of India.  *Id.* ¶ 30.

## ISSUE PRESENTED FOR REVIEW

Whether the district court erred in concluding that post-judgment interest did not accrue from the entry of the judgment on October 3, 2017, but instead accrued from the July 12, 2022 entry of the amended judgment that excluded the constitutionally excessive portion of the punitive-damages award and otherwise left the judgment unchanged.

## STATEMENT OF THE CASE

The history of this dispute is recounted in the first two appeals. This brief recites the facts pertinent to the date on which post-judgment interest began to accrue.

### A.    The Dispute Between Epic and TCS

Epic Systems "is a leading developer of electronic-health-record software" based in Wisconsin. *Epic I*, 980 F.3d at 1124. TCS is an Indian provider of "software testing and consulting" that also sold a competing product, Med Mantra, predominantly in India. *Id.* TCS sought to "enter the United States market and compete directly with Epic." *Id.* at 1131-32.

To do so, TCS engaged in a multiyear scheme to steal Epic's trade secrets. This Court succinctly summarized TCS's "brazen misconduct" as follows:

> From 2012 to 2014, TCS employees accessed Epic's confidential customer web portal without authorization and downloaded thousands of documents containing Epic trade secrets. Armed with this stolen information, TCS created a 'comparative analysis' outlining the differences between its software and Epic's. TCS then used this analysis to try to persuade one of Epic's largest customers to abandon Epic in favor of TCS.

*Epic II*, 2023 WL 4542011, at *1, *3. Those actions came to light in 2014, when a TCS employee reported to Epic his concerns that TCS had used Epic's confidential information to improve Med Mantra. *Epic I*, 980 F.3d at 1125-26.

TCS's misconduct did not stop with that disclosure. When Epic looked into the whistleblower's claims, TCS employees—acting on instructions to "hide the truth from investigators"—repeatedly "lied to prevent ... Epic from discovering that TCS had access to Epic's [data]." *Id.* at 1142. "To make matters worse," after Epic sued, "TCS failed to preserve relevant evidence, resulting in an adverse inference sanction at trial." *Epic II*, 2023 WL 4542011, at *1.

All told, "TCS stole thousands of Epic's documents, lied about it, covered it up, and used Epic's information in a variety of ways" to benefit its own business. *Epic I*, 980 F.3d at 1140.

## B.    The Jury's Verdicts and TCS's Post-Trial Motions

Epic filed suit in October 2014, R.1, alleging violations of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and causes of action under Wisconsin law, *see* R.1, R.290 ¶¶ 70-140.

The district court bifurcated the trial into liability and damages phases. *See Epic I*, 980 F.3d at 1126. After the liability phase, "[t]he jury returned a verdict in favor of Epic on all claims." *Id.* The next day, in the damages phase, "[t]he jury returned a $940 million total damages award: $140 million for [the benefit TCS derived from its] uses of the comparative analysis, $100 million for [the benefit TCS derived from its] uses of 'other' confidential information, and $700 million in punitive damages." *Id.* at 1127; *see* R.871.

6

Thereafter, by three motions under Federal Rule of Civil Procedure 50, TCS sought judgment as a matter of law.  TCS's first two motions challenged the liability verdict, arguing that the jury lacked "a legally sufficient evidentiary basis to find for Epic on any of its claims."  R.830 at 1; *see* R.843.  Its third motion attacked the damages awards.  R.914.  TCS argued that the jury's compensatory-damages award lacked a sufficient evidentiary basis.  *Id.* at 8-46.  And TCS argued that the jury's punitive-damages award should be vacated because it was not supported by sufficient evidence of either Epic's "actual injury" or TCS's "willful and malicious" conduct and "intentional disregard" of Epic's rights—all purported requirements of Wisconsin law.  *Id.* at 46-52.  Alternatively, TCS asked that the punitive-damages award be reduced because (1) Wisconsin law caps punitive damages at twice the compensatory-damages award, and because (2) even a two-to-one ratio of punitive-to-compensatory damages was excessive under both Wisconsin law and the federal Due Process Clause.  *Id.* at 52-66.

The district court rejected the bulk of TCS's arguments.  It denied TCS's motion as to liability, finding "ample evidence" supporting the jury's verdict on each of Epic's claims.  R.976 at 3-7.  As to compensatory damages, the court upheld the "$140 million [award] … based on TCS's use of Epic's confidential information in the 'comparative analysis,' [but] struck the $100 million … award for 'other uses' of Epic's information," *Epic II*, 2023 WL 4542011, at *1, finding the latter award unsupported by the evidence, R.976 at 8-14.  Turning to punitive damages, the district court rejected TCS's argument "that its conduct was [insufficiently] 'willful and malicious' to justify a punitive damages award" as

7

"meritless, if not frivolous," and held that "more than sufficient evidence" supported the jury's finding that TCS acted in "intentional disregard of Epic's rights." *Id.* at 15-17 (emphasis omitted).

With Epic's right to collect punitive damages thus established, the court considered the size of the punitive-damages award. Epic agreed with TCS that Wisconsin law imposed a two-to-one cap on punitive damages—or $280 million now that the compensatory-damages award was reduced to $140 million. *Id.* at 17. That left the question whether the award should be reduced *below* that statutory cap because it was excessive under state or federal due process principles. *See id.* at 17-22.

The district court held that the two-to-one punitive-damages award was appropriate. Applying *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996), the district found that because Epic "presented evidence of TCS employees' widespread, knowing and unauthorized access and downloading of Epic's confidential information, with TCS supervisors at least aware of this misconduct and choosing to turn a blind eye to it, if not actively encouraging it, as well as TCS's failure to investigate timely or adequately the unauthorized access and resulting spoliation of evidence," there was sufficient evidence of TCS's "reprehensibility, grievousness[,] and malicious intent" to justify punitive damages. R.976 at 18. It further held that the two-to-one award—the maximum allowable under Wisconsin law—was "reasonable," adding that, "[i]f anything, TCS's suppression of evidence that might have justified a higher compensatory award[] argue[d] for a larger multiple." *Id.* at 19-20. The court thus concluded

8

that TCS had "fail[ed] to convince [it] that an award of less than a 2:1 ratio [was] necessary." *Id.* at 20.

### C.     The 2017 Judgment and TCS's Post-Judgment Motion

Having resolved TCS's post-trial motions, on October 3, 2017, the district court entered judgment in Epic's favor on all claims "in the amount of $420,000,000.00," A12-13, $140 million in compensatory damages plus $280 million in punitive damages, *see* R.976 at 2.

"TCS then filed a post-judgment motion under Rules 50(b) and 59, again seeking judgment as a matter of law, or in the alternative, a new trial." *Epic I*, 980 F.3d at 1128; *see* R.997. The district court denied this motion in full because it "largely repeat[ed] the same arguments previously raised in [TCS's] Rule 50(a) motion and previously rejected by the court." R.1022 at 1. The motion contained one new argument, however—that the punitive-damages award "must be vacated in light of the [district] [c]ourt's ruling vacating the jury's compensatory damages award in part." R.997 at 53 (bold typeface omitted). The district court called this argument "[n]onsense" and reaffirmed its earlier decision that TCS's other challenges to the jury's punitive-damages award "ha[d] no merit." R.1022 at 15-17.

### D.     *Epic I*

TCS appealed, abandoning its challenges to the liability verdicts and instead challenging only the damages awards.

*Compensatory damages.* This Court affirmed the jury's $140 million compensatory-damages award, explaining that the jury was entitled to award

damages based upon "the benefit conferred upon [TCS]" from using Epic's trade secrets and that, given the evidence presented at trial, the jury reasonably "value[d] that benefit—avoided research and development costs—at $140 million." *Epic I*, 980 F.3d at 1129-33 (quotation omitted).

_Punitive damages._   As to punitive damages, TCS raised four arguments. "First, TCS argue[d] that, to receive punitive damages under Wisconsin law, the plaintiff must prove an actual injury—which Epic did not do.   Second, TCS argue[d] that the punitive-damages award here must be set aside because it may have been based on a claim that cannot support punitive damages as a matter of law.   Third, TCS argue[d] that the punitive-damages award must be vacated and retried in light of the district court's decision to vacate the $100 million compensatory-damages award.   Finally, TCS argue[d] the punitive-damages award [was] constitutionally excessive." *Id.* at 1137.

This Court rejected TCS's first three arguments.   It held that TCS was "incorrect that Wisconsin law require[d] Epic to prove an 'actual injury' to obtain punitive damages." *Id.* at 1137-38.   It "quickly dispose[d]" of TCS's second argument, holding that the jury followed instructions and awarded punitive damages only "with respect to" claims that TCS itself "admit[ted] … 'could support punitive damages.'" *Id.* at 1138 (quotation omitted).   Next, it held that TCS's argument that the partial vacatur of the compensatory-damages award undermined the punitive-damages verdict "fundamentally misunderst[ood] punitive damages," which are "based on the defendant's conduct underlying [the] plaintiff's claims"—here, TCS's scheme to "st[eal]

10

thousands of Epic's documents, lie[] about it, cover[] it up, and use[] Epic's information." *Id.* at 1138-40.

With Epic's entitlement to collect punitive damages confirmed, this Court turned to TCS's remaining argument that the size of the award "violate[d] [TCS's] due process rights under the federal constitution and Wisconsin law," which this Court explained employ the same standard. *Id.* at 1140-41, 1141 n.4. This Court, like the district court, applied *Gore*'s three-factor framework. *See id.* at 1141. Applying those factors, this Court "agree[d] with the district court that TCS's conduct warrant[ed] punishment" in the form of punitive damages, because "TCS's conduct consisted of a repeated course of wrongful actions spanning multiple years" and that conduct was "intentional and deceitful, not [merely] negligent." *Id.* at 1141-42. But the Court relied upon the facts that "TCS caused no physical harm to Epic" and "did not recklessly disregard the safety of others," that "Epic is not a financially vulnerable plaintiff," and that the compensatory award was "substantial," to conclude "that the maximum permissible award of punitive damages in this case is $140 million—a 1:1 ratio relative to the compensatory award." *Id.* at 1142-45. It vacated the judgment and "remand[ed] for the district court to amend its judgment and reduce punitive damages to, at most, $140 million." *Id.* at 1145-46.

After the proceedings in *Epic I*, Epic demanded payment—pursuant to the letter of credit securing the judgment—of the $140 million compensatory award, post-judgment interest on that award accruing from the 2017 judgment, and costs. R.1044 at 2. Epic received those amounts. R.1043 at 3-4.

### E.     Proceedings on Remand From *Epic I*

On remand the district court ordered the parties to brief the question "why the court should not award $140 million in punitive damages."  R.1036.  Epic argued that the district court's prior holding that a punitive-damages award of $280 million was "supported by the evidence and Wisconsin law," coupled with this Court's holding that "a punitive damage award of $140 million complies with the Due Process Clause," compelled entry of an amended judgment for $140 million.  R.1041 at 3.  TCS, by contrast, sought plenary reconsideration of the issue, arguing that a punitive-damages award of just $10 to $25 million was all that was justified.  R.1040 at 2-3.

The district court rejected TCS's invitation to "writ[e] on a clean slate" and held that a $140 million award was justified.  R.1045 at 3-4, 7.  The court observed that it had previously held that "punitive damages were available" and that "there was a legally sufficient basis for the jury's punitive damages award," and explained that *Epic I*'s due process analysis "did not upset" those holdings. *Id.* at 4.  It thus determined that its task was to decide whether a $140 million punitive-damages award "[was] still constitutionally infirm."  *Id.* at 7.  Finding most of TCS's arguments waived, foreclosed by this Court's decision in *Epic I*, or better made "to a jury" at trial than to the court on this limited remand, the district court concluded that TCS had not identified any "principled, constitutional basis for a further reduction" or offered "additional reasons ... for th[e] court to reconsider [either] the jury's findings []or its own analysis that [TCS]

acted willfully and reprehensibly with the expectation and determination that they would not be caught." *Id.* at 6-7.

The district court ordered "[t]he jury's award of punitive damages … reduced to $140 million" and directed the clerk "to file an amended final judgment, replacing the fourth paragraph of the original judgment" with language reflecting a reduced total damages award of $280 million. *Id.* at 8. "In all other respects," the court stated, the "original, final judgment remains unchanged." *Id.* The clerk entered that amended judgment on July 12, 2022. R.1046, A10-11.

### F.  *Epic II*

TCS again appealed, this time arguing that the district court's analysis "was insufficient because it simply rehashed the *Gore* factors already considered by this Court in the first appeal." *Epic II*, 2023 WL 4542011, at *2. This Court rejected TCS's argument, finding that TCS had simply "repeat[ed] many of the same arguments" that the Court rejected in *Epic I. Id.* at *3. This Court affirmed, "agree[ing] with the district court that, given TCS's repeated and brazen misconduct, a $140 million punitive damages award [was] constitutional, as well as justified under Wisconsin law." *Id.* After the Supreme Court denied TCS's certiorari petition, *see Tata Consultancy Servs. Ltd. v. Epic Sys. Corp.*, 144 S. Ct. 425 (2023), Epic demanded payment of the $140 million punitive-damages award, R.1063 at 3-4. Epic received payment on December 1, 2023. *Id.* at 4.

### G.    Proceedings on Remand From *Epic II*

One final dispute remained.  Under 28 U.S.C. § 1961(a), Epic is entitled to collect post-judgment interest.  The parties had previously agreed that post-judgment interest on the compensatory damages and award of costs ran from the initial judgment—October 3, 2017—until those amounts were paid.  R.1043 at 4 & n.1.  Epic contended that the same date should govern the accrual of post-judgment interest on the punitive-damages award.  R.1057 at 2.  After all, as Epic had pointed out earlier, "by having $140 million to use in its business since October 3, 2017," TCS had, given its publicly reported "average return of 44.89% on equity" during the relevant period, likely benefited to the tune of several hundred million dollars.  R.1044 at 3-4.  TCS, by contrast, contended that interest did not start to run on the punitive-damages award until July 12, 2022, when the district court entered its amended judgment on remand from *Epic II*.  R.1062 at 6.  Under Epic's view, TCS owed $11.7 million in post-judgment interest.  R.1063 at 4.  Under TCS's view, it owed $5.6 million.  *Id.*

The district court agreed with TCS.  R.1065, A1-9.  It began by explaining that "[w]hen there are multiple judgments entered, as in this case, post-judgment interest accrues from the date of the judgment for which damages could be 'ascertained in any meaningful way,'" A4 (quoting *Kaiser*, 494 U.S. at 835-36), meaning that "if 'a first judgment lacks an evidentiary or legal basis, post-judgment interest accrues from the date of the second judgment,'" *id.* (quoting *Cordero v. De Jesus-Mendez*, 922 F.2d 11, 16 (1st Cir. 1990)).  It further noted that no "Supreme Court or Seventh Circuit [case] … directly addresse[d] the

question whether a punitive award later vacated on constitutional grounds and remanded for redetermination was nevertheless 'meaningfully ascertainable' on the date of the original judgment." A4 (emphasis omitted). Acknowledging the state of authority, Epic had cited out-of-circuit decisions holding that "subsequent reductions on appeal of an award of punitive damages should not affect the date from which post-judgment interest runs" so long as they do not undermine either "the evidentiary basis ... []or the legal foundation for [the] award." A4-5 (quoting *Exxon Valdez v. Exxon Mobil*, 568 F.3d 1077, 1080 (9th Cir. 2009)); *see also* A5 (discussing *Johansen*, 170 F.3d at 1339).

The district court rejected Epic's argument. While acknowledging that this Court in *Epic I* "held ... that there *was* a legal basis for a punitive damages award and [that] ample evidence at trial supported that award," it distinguished Epic's cases on the basis that this Court "*vacated* the punitive damage award and directed th[e] [district] court to reduce the award." A6. The court "agree[d] with [TCS] that this case [was] more similar to two Seventh Circuit cases," *Divane v. Krull Electric Co. (Divane II)*, 319 F.3d 307 (7th Cir. 2003), and *Harris v. Chicago Great Western Railway Co.*, 197 F.2d 829 (7th Cir. 1952), which it described as holding that, where "the original judgment had *not* been supported by evidence of the specific damages to which the prevailing party was entitled," interest should run only from the entry of the amended judgment. A7-8.

Relying on those cases, the district court held that, "[b]ecause the Seventh Circuit's mandate required [it] to again consider the legal and evidentiary issues on remand," "the legal and factual bases for the court's punitive damages award

15

[were] arguably *not* meaningfully ascertained until after th[e] [district] court considered the due process factors on remand." A7. It thus held that post-judgment interest did not begin to accrue "until th[e] [district] court complied with the Seventh Circuit's instruction on remand and entered an amended final judgment on July 12, 2022." A8.

## STANDARD OF REVIEW

A district court's "determination as to when postjudgment interest should begin" to accrue "raises a legal issue," *Radford Tr. v. First Unum Life Ins. Co. of Am.*, 491 F.3d 21, 24 (1st Cir. 2007), that "hinges on statutory interpretation" of Section 1961(a), *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 100 (2d Cir. 2004). Accordingly, this Court's review of the district court's decision that post-judgment interest accrued from July 12, 2022, rather than October 3, 2017, is de novo. *See id.*; *Radford Tr.*, 491 F.3d at 24; *Art Midwest, Inc. v. Clapper*, 805 F.3d 611, 614 (5th Cir. 2015); *see also, e.g.*, *Centerpoint Energy Servs., Inc. v. Halim*, 743 F.3d 503, 507-09 (7th Cir. 2014) (reviewing de novo the question of what interest rate was required by Section 1961(a)).

## SUMMARY OF ARGUMENT

The district court erred in concluding that post-judgment interest accrued from the amended judgment in 2022 rather than the original 2017 judgment. Under Section 1961(a), post-judgment interest serves to "compensate the successful plaintiff," *Kaiser*, 494 U.S. at 835 (quotation omitted), for the time after the entry of judgment during which "the adjudicated wrongdoer" retains the use of "money that rightfully belong[s] to [the plaintiff]," *Merit Ins.*, 728 F.2d

at 945.  In this case, Epic became the successful plaintiff, and TCS the adjudicated wrongdoer, when the district court entered judgment on the jury's punitive-damages award on October 3, 2017.  *See* A12-17.  While subsequent proceedings reduced the amount of Epic's ultimate recovery, they did not undermine the factual or legal basis of Epic's entitlement to punitive damages.  Post-judgment interest therefore accrues from the October 3, 2017 judgment.

The text of Section 1961(a) and the cases applying it confirm that commonsense conclusion.  Interest begins to run when a "money judgment" is "recovered," 28 U.S.C. § 1961(a), which refers to the point at which the plaintiff achieves success in the suit—that is, the date of the judgment reflecting the plaintiff's legal and factual entitlement to collect money.  The Supreme Court's application of a textually similar precursor to Section 1961(a), moreover, makes clear that if subsequent proceedings vindicate the plaintiff's entitlement to damages in "substance," the label applied to those proceedings—be it affirmed, vacated, or reversed—is "immaterial."  *Kneeland v. Am. Loan & Tr. Co.* (*Kneeland II*), 138 U.S. 509, 511-12 (1891).  And the courts of appeals consistently hold that, where a district court's "initial [money] judgment is supported by the evidence" but is later vacated and reduced because "a certain portion of that judgment [is] excessive"—including, as relevant here, under the Due Process Clause—"post-judgment interest should run from the date of the original judgment."  *Johansen*, 170 F.3d at 1339-40.

Those principles resolve this appeal in Epic's favor.  In *Epic I,* this Court affirmed that punitive damages were available and that TCS's conduct

"warrant[ed] punishment" in the form of punitive damages. 980 F.3d at 1137-42. This Court thus affirmed the factual and legal bases of the jury's punitive-damages verdict, confirming that Epic became "the successful plaintiff," *Kaiser*, 494 U.S. at 835 (quotation omitted), when the district court entered judgment on that verdict in October 2017.

That is all that matters under Section 1961(a). This Court's subsequent conclusion that the Due Process Clause capped the *amount* of allowable punitive damages in this case did not involve a determination that the initial judgment "lack[ed] legal basis or require[d] further factual development." *Lewis v. Whelan*, 99 F.3d 542, 545 (2d Cir. 1996). Instead, it involved "lopping off" "the unlawful excess" in the original judgment, *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935), such that the original judgment was "correct to the extent of $[140] million," *Johansen*, 170 F.3d at 1340. Thus, interest on that portion of the original judgment accrues from the date the judgment was "recovered," 28 U.S.C. § 1961(a)—October 3, 2017.

The district court's contrary conclusion contravenes the text of Section 1961(a) and the body of case law interpreting it. And it undermines the statute's purpose by requiring Epic, the successful plaintiff, to provide TCS, the adjudicated wrongdoer, with a five-year, interest-free loan of $140 million "that rightfully belonged to [Epic]." *Merit Ins.*, 728 F.2d at 945. Epic therefore asks this Court to reverse the district court's error and hold that post-judgment interest on Epic's punitive-damages award began to accrue when the district court's judgment was entered on October 3, 2017.

18

**ARGUMENT**

I. **POST-JUDGMENT INTEREST UNDER SECTION 1961(a) RUNS FROM THE ENTRY OF THE JUDGMENT ESTABLISHING THE LEGAL AND FACTUAL BASES FOR THE PLAINTIFF'S ENTITLEMENT TO DAMAGES.**

When interpreting a federal statute, this Court "begin[s] with the text of the statute." *Consumer Fin. Prot. Bureau v. Townstone Fin., Inc.*, 107 F.4th 768, 776 (7th Cir. 2024). While the interpretation of a statute is "first and foremost[] a textual question, .... '[t]he specific context in which th[e relevant] language is used, and the broader context of the statute as a whole' have a role to play when the meaning of a statutory term is in doubt." *United States v. Chaoqun*, 107 F.4th 715, 728-29 (7th Cir. 2024) (quoting *Yates v. United States*, 574 U.S. 528, 537 (2015)). In other words, this Court should review the statute's text "in context," *Pulsifer v. United States*, 601 U.S. 124, 133 (2024), "and context includes the purpose of the text," *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 108 F.4th 458, 482 (7th Cir. 2024) (citation omitted); *see, e.g.*, *Smith v. Spizzirri*, 601 U.S. 472, 475 (2024) (considering the "text, structure, and purpose" of the relevant provision).

Assessing the text of Section 1961(a) in context reveals that post-judgment interest begins to accrue on the date of the judgment establishing the legal and factual bases for the plaintiff's damages award and that subsequent developments that do not upset those bases do not restart the clock.

**A.  Tools for Interpreting Section 1961(a) Direct That Interest Begins to Accrue Upon the District Court's Entry of the Judgment Establishing the Legal and Factual Bases for the Plaintiff's Entitlement to Damages.**

Epic starts with the text of Section 1961(a).  The statute's first sentence states that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court."  28 U.S.C. § 1961(a).  And its third sentence states that "[s]uch interest shall be calculated from the date of the entry of the judgment," and at a specified rate.  *Id.*  It is therefore apparent that, when Section 1961(a)'s third sentence refers to "the date of the entry of *the judgment*," its antecedent is the "money judgment ... recovered in a district court" mentioned in the first sentence.  28 U.S.C. § 1961(a) (emphasis added).

This case requires deciding when a "money judgment" is "recovered" within the meaning of Section 1961(a): Did Epic "recover[]" a "money judgment" in 2017, when judgment was entered on the jury's punitive-damages verdict, or only in 2022, when that judgment was amended to strike the constitutionally excessive portion of the damages?  "[T]he [statutory] context of these words—the water in which they swim—indicates that Congress used them as terms of art," and "when Congress 'borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas ... attached to each borrowed word.'"  *United States v. Hansen*, 599 U.S. 762, 774-75 (2023) (citations omitted).  That is, it "brings the old soil with it."  *George v. McDonough*, 596 U.S. 740, 746 (2022) (citation omitted).

To excavate that old soil, two tools have proven particularly useful.  *First*, courts regularly consult "[l]egal dictionaries" "contemporaneous" to the time of

drafting to define legal terms of art used in federal statutes. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 810-11 (2024) (relying on legal dictionaries to define "accrues" under 28 U.S.C. § 2401(a)); *see also Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*, 532 U.S. 598, 603 (2001) (same to define the term "prevailing party"). Doing so helps ensure the court is "understanding the word[s] in the way [the statute's] drafters intended." *Bevis v. City of Naperville*, 85 F.4th 1175, 1194 (7th Cir. 2023), *cert. denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024). *Second*, courts consider "judicial precedent interpreting [any] precursor statute[s]." *Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc.*, 764 F.3d 1199, 1239 (10th Cir. 2014), *cert. denied*, 574 U.S. 1074 (2015); *see Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 648 (2010) ("We normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent.").

These sources of accumulated meaning, together with the statute's purpose, confirm that, under Section 1961(a), post-judgment interest accrues from the date of entry of the judgment reflecting the legal and factual bases for the plaintiff's entitlement to collect damages, and that subsequent proceedings merely reducing the *amount* of damages do not restart the clock.

### 1.   Legal Dictionaries Demonstrate That a Money Judgment Is Recovered When the Plaintiff's Entitlement to Damages Is Established.

Section 1961 was enacted in 1948. *See* Act of June 26, 1948, ch. 125, § 1961, 62 Stat. 869, 957-58. Legal dictionaries contemporaneous with that enactment define a court's "judgment" as its "official and authentic decision …

upon the respective rights and claims of the parties to an action or suit therein litigated and submitted to its determination," Black's Law Dictionary 976-77 (4th ed. 1951) ("Black's IV"), or, more simply, its "conclusion of law upon facts found," Black's Law Dictionary 1024 (3d ed. 1933) ("Black's III"); *see* Ballentine's Law Dictionary 696 (2d ed. 1948) ("Ballentine's II") ("The sentence of the law upon the record; the application of the law to the facts and the pleadings."). The term "money judgment," in turn, distinguishes a judgment (as just defined) that directs "the payment of a sum of money ... from one directing an act to be done or property to be restored or transferred." Black's IV at 980; *see* Black's III at 1029 (same); Ballentine's II at 829 ("A judgment which can be fully satisfied by a payment of money."). Accordingly, a money judgment is a district court's conclusion that a prevailing party is entitled to collect money. And such a judgment is "recover[ed]" when it is "w[on]," meaning the point when the plaintiff becomes "successful in [the] suit." Black's IV at 1440; Ballentine's II at 1098 ("To acquire by means of litigation.").

Thus, the "date of the entry of" a "money judgment ... recovered in a district court," 28 U.S.C. § 1961(a), is the date of the judgment reflecting the court's determination that the prevailing party has won a right to collect money. Once this right is established in a district court judgment, a "money judgment" has been "recovered" within the meaning of Section 1961(a), and post-judgment interest accrues from the "date of the entry of th[at] judgment." *Id.*

### 2. Pre-Enactment Precedent Instructs That Courts Deciding Whether Subsequent Proceedings Affect When a Judgment Was "Recovered" Must Look to Whether the Judgment Was Affirmed in "Substance" Rather Than in "Form."

The Supreme Court's decision in *Kneeland v. American Loan & Trust Co.* (*Kneeland II*), 138 U.S. 509 (1891), which applied a precursor to Section 1961(a), demonstrates that courts assessing when a judgment was recovered must look to the "substance" of subsequent proceedings rather than their "form." *Id.* at 511-12. When the plaintiff's entitlement to collect damages is vindicated on appeal, that substance controls for purposes of post-judgment interest, regardless of whether the appeal resulted in an affirmance, a reversal, or a vacatur of the initial judgment.

The statutory right of a successful plaintiff to post-judgment interest has existed in federal law since at least 1842. *See, e.g.*, Act of Aug. 23, 1842, ch. 188, § 8, 5 Stat. 516, 518 (providing "[t]hat on all judgments in civil cases, hereafter recovered in the circuit or district courts of the United States, interest shall be allowed"). And in 1874, Congress enacted Revised Statute § 966, which provided that "[i]nterest shall be allowed on all judgments in civil causes, recovered in a circuit or district court." Rev. Stat. § 966, 1 Rev. Stat. 182 (1875); *see* 2 Rev. Stat. 182 (1878) (reenacting the same provision).

Against that backdrop, the Court decided *Kneeland II*. The case was a follow-on to *Kneeland v. American Loan & Trust Co.* (*Kneeland I*), a dispute "between a purchaser at foreclosure sales of certain railroad property[] and intervening creditors." 136 U.S. 89, 90 (1890). In *Kneeland I*, the circuit court found that the purchaser owed rental payments to the creditors for 17 months.

*See Kneeland II*, 138 U.S. at 510-11.  The Supreme Court held that, while the circuit court properly calculated the property's rental value, it erred in directing the payment of rent for the first four of the 17 months.  *See id.*  The Court thus "reversed" the judgment below and "remanded with instructions to strike out all allowances for rental prior to December 1, 1883, ... and to allow the rentals as fixed for the time subsequent thereto." *Kneeland I*, 136 U.S. at 103.  On remand, the circuit court entered a new judgment to that effect and "awarded interest thereon from the date of the former decrees." *Kneeland II*, 138 U.S. at 511.

The Supreme Court in *Kneeland II* affirmed the decision to run interest from the date of the earlier judgment, explaining that:

> While the former decrees were in terms reversed, and the cases remanded for the entering of new decrees, yet the terms of those new decrees were specifically stated; and, in so far as the separate and distinct matters embraced in the former decrees were ordered to be incorporated into the new, it is to be regarded as *pro tanto* an affirmance.  Equity regards the substance, and not the form.  The rights of parties are not to be sacrificed to the mere letter; and whether the language used was reversed, modified, or affirmed in part and reversed in part is immaterial.  Equity looks beyond these words of description to see what was in fact ordered to be done.

*Id.* at 511-12.

*Kneeland II* teaches two important lessons for this case.  *First*, the accrual of post-judgment interest turns on the "substance" of "what was in fact ordered to be done" by a court on appeal, not the "form" those orders took.  *Id.*  Whether the outcome is labeled a "reversal" or otherwise "is immaterial" to when post-judgment interest begins to accrue.  *Id.*  *Second*, when determining the "substance" that matters, courts should assess whether, and to what extent,

"matters embraced in [an earlier] decree" have been "incorporated into the new." *Id.* Post-judgment interest on those portions of the new judgment accrues from the date of the earlier judgment.

Because Section 1961(a) "brings th[is] old soil with it," *George*, 596 U.S. at 746 (citation omitted), courts applying it should apply both of these lessons to determine when post-judgment interest begins to run.

### 3.    Section 1961(a)'s Purpose Confirms These Conclusions.

The purpose of Section 1961(a) confirms that post-judgment interest begins accruing when a judgment is entered reflecting the plaintiff's legal and evidentiary entitlement to damages, and that subsequent proceedings reducing the amount of damages do not restart the clock. As the Supreme Court explained in *Kaiser*, "[t]he purpose of postjudgment interest [under Section 1961(a)] is to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant." 494 U.S. at 835-36 (citation omitted). The Court's focus on compensation for a "successful plaintiff," *id.*, mirrors the statute's focus on the moment at which the plaintiff "recovered" a judgment, 28 U.S.C. § 1961(a)—*i.e.*, became "successful in [the] suit," Black's IV at 1440. By tying the accrual of post-judgment interest to the moment when the plaintiff achieves success in this way, Section 1961(a) ensures that a plaintiff "whose position on the merits [has been] vindicated" is fully compensated and that "adjudicated wrongdoer[s]" may not "enjoy, interest free, money that rightfully belonged to [the plaintiff]." *Merit Ins.*, 728 F.2d at 945.

At bottom, the text, historical context, and purpose of Section 1961(a) point in the same direction. Interest accrues under Section 1961(a) once a judgment is "recovered," 28 U.S.C. § 1961(a), meaning the point at which the plaintiff achieves "success[] in [the] suit," Black's IV at 1440. That inquiry looks to the "substance" of the proceedings rather than their "form." *Kneeland II*, 138 U.S. at 511-12. And if that "substance" reveals that part of the original judgment is "incorporated into the [later judgment]," post-judgment interest accrues from the date of the earlier judgment that first "embraced" those matters. *Id.* That reading ensures that successful parties are not compelled to loan money that is rightfully theirs to "adjudicated wrongdoer[s]" interest-free. *Merit Ins.*, 728 F.2d at 945.

### B. Cases Applying Section 1961(a) Confirm That, Once the Plaintiff's Entitlement to Collect Damages Is Established as a Matter of Fact and Law, Subsequent Developments That Only Reduce the Amount of Damages Do Not Restart the Clock.

Drawing on language from the Supreme Court's decision in *Kaiser*, courts have interpreted Section 1961(a) to hold that interest begins to accrue from the point at which damages are "'ascertained' in a[] meaningful way," *Kaiser*, 494 U.S. at 836, or simply "meaningfully ascertained," A4-5; *see, e.g.*, *Exxon Valdez v. Exxon Mobil*, 568 F.3d 1077, 1080 (9th Cir. 2009).

While that phrase does not appear in Section 1961(a), the relevant case law indicates that courts—this one included—employ the "meaningfully ascertained" standard as shorthand for the rules discussed above that flow from Section 1961(a)'s text. *First*, when the bases for an earlier judgment are factually and legally sound, post-judgment interest accrues from the entry of that

26

judgment—even if later developments reduce the amount of damages owed, and even if the initial judgment has been formally vacated. *Second*, and by contrast, post-judgment interest does *not* accrue from the entry of a judgment later deemed unsupported by both a valid legal theory and a legally sufficient showing of fact. Accordingly, courts applying Section 1961(a) to a punitive-damages judgment later deemed excessive have uniformly held that post-judgment interest runs from the entry of the original judgment.

### 1. Vacatur of a Judgment on Grounds That Leave the Bases for the Plaintiff's Damages Award Undisturbed Does Not Restart the Clock Under Section 1961(a).

In cases where subsequent legal proceedings limit the *amount* of collectable damages on grounds that do not undermine the factual or legal basis for the original damages judgment, courts deem damages "meaningfully ascertained" as of the entry of the earlier judgment, even when the earlier judgment was vacated. *See, e.g.*, *Exxon*, 568 F.3d at 1080; *Johansen*, 170 F.3d at 1339-40; *Dunn v. HOVIC*, 13 F.3d 58, 60-62 (3d Cir. 1993); *Tinsley v. Sea-Land Corp.*, 979 F.2d 1382, 1383 (9th Cir. 1992) (per curiam); *Coal Res., Inc. v. Gulf & W. Indus., Inc.*, 954 F.2d 1263, 1274-75 (6th Cir. 1992); *N. Nat. Gas Co. v. Hegler*, 818 F.2d 730, 737-38 (10th Cir. 1987).

A court's conclusion that a punitive-damages award is excessive (constitutionally or otherwise) does not undermine the factual or legal basis of that award. *See* pp. 39-41, *infra.* As a result, in *every* case of which Epic is aware applying Section 1961(a) to a punitive-damages award that had been vacated and subsequently reduced on constitutional or similar grounds, the

courts of appeals have held that interest on the amount of punitive damages ultimately deemed permissible accrues from the date of the earlier, since-vacated judgment on the jury's initial punitive-damages award. *See Johansen*, 170 F.3d at 1339-40 (award vacated on constitutional due process grounds); *Dunn*, 13 F.3d at 60-62 (same); *Exxon*, 568 F.3d at 1080 (award vacated under similar principles of federal admiralty law).

*Johansen v. Combustion Engineering, Inc.*, 170 F.3d 1320 (11th Cir. 1999), is a prime example. There, "[p]roperty owners brought a nuisance and trespass action against the present owners of a former mining site" alleging that toxic water had escaped from the mine and damaged their properties. *Id.* at 1326. The jury awarded the plaintiffs $47,000 in compensatory damages and $45 *million* in punitive damages, an amount the district court found "shocking" and reduced to $15 million. *Id.* at 1327. The Eleventh Circuit affirmed the punitive-damages award (now $12 million against $43,500 in compensatory damages after three plaintiffs settled), but the award was subsequently vacated by the Supreme Court in light of its decision in *Gore*. *See id.* On remand, "[t]he district court reexamined the punitive damage award under [the new *Gore* framework]," concluded that a 100:1 award of $4.35 million was the constitutional maximum, and entered a new judgment to that effect. *Id.* at 1327.

On a second appeal, the Eleventh Circuit affirmed the new punitive-damages award of $4.35 million and held that interest on that reduced award should accrue from the date of entry of the initial $15 million judgment. *Id.* at 1339-40. The court of appeals observed that, "[w]here the initial judgment is

28

supported by the evidence and the later judgment merely reflects a remittitur of a certain portion of that judgment as excessive, the courts of appeals have routinely decided that damages were sufficiently 'ascertained' at the time of the first judgment and that post-judgment interest should run from the date of the original judgment," on the view that "[t]he initial judgment is ... correct to the extent it is permitted to stand." *Id.* (collecting cases). The court found "this reasoning ... especially applicable in the context of a constitutionally excessive verdict." *Id.* at 1340. It thus concluded that "[t]he jury's [original] punitive damage award[]," while subsequently reduced, vacated, and then reduced again, was "correct to the extent of $4.35 million," and should therefore be treated as having been "partially affirmed" in that amount, triggering the accrual of post-judgment interest from the date of the initial judgment. *Id.*

The reasoning of *Johansen* and cases like it—treating a judgment that has been reduced on grounds that do not undermine "[]either the evidentiary basis for the award [or its] legal foundation," *Exxon*, 568 F.3d at 1080, as having been "partially affirmed" "to the extent it is permitted to stand," *Johansen*, 170 F.3d at 1340—follows directly from the Supreme Court's decision in *Kneeland II*. A money judgment that has been vacated only on grounds that do not call into question the plaintiff's entitlement to at least *some portion* of the original judgment is still "recovered" for purposes of Section 1961(a), because such a vacatur is, in "substance," "*pro tanto* an affirmance" of the plaintiff's legal and factual entitlement to damages, and the damages "embraced in the [prior

judgment]" are "incorporated into the new," *Kneeland II*, 138 U.S. at 511-12, in the amount ultimately deemed legally permissible.

### 2.      Interest Does Not Accrue on a Judgment Based on Legally Insufficient Facts or an Erroneous Legal Theory.

In contrast, subsequent proceedings in the case *will* restart the post-judgment interest clock if they undermine the factual or legal basis for the initial money judgment, such that the plaintiff can no longer be deemed to have "recovered" a judgment for damages on that earlier date.

*Kaiser* illustrates the point. In that case, a jury initially awarded Bonjorno over $5 million in damages for violations of the Sherman Act, and the district court entered judgment. 494 U.S. at 829-30. But the district court subsequently concluded that "the evidence did not support the jury's damages award" and that "a limited retrial on damages" was required. *Id.* at 830. At that point, Bonjorno had no longer "recovered" a "money judgment." 28 U.S.C. § 1961(a). Just the opposite: The district court's "conclusion of law upon [the] facts found," Black's III at 1024, was that Bonjorno was *not* entitled to money damages, because he had not carried his burden of proof with respect to those damages. As a result, the Supreme Court held, post-judgment interest would not begin to accrue until the entry of judgment following the retrial. *Kaiser*, 494 U.S. at 830, 835-36.

*Kaiser* demonstrates that post-judgment interest cannot accrue on a judgment that "lack[ed] a legal basis or require[d] further factual development." *Lewis*, 99 F.3d at 545. Cases from around the country adhere to this principle. *See, e.g.*, *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1097 (10th Cir. 1991)

(interest did not accrue on a prior judgment that was vacated based upon "errors 'which affected the basic issues' of the trial" (citation omitted)); *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1416, 1447 (6th Cir. 1990) (same where original judgment vacated based on legally insufficient proof and new trial ordered as to both liability and damages); *Ashland Oil, Inc. v. Phillips Petroleum Co.*, 607 F.2d 335, 336 (10th Cir. 1979) (per curiam) (same where original judgment vacated and district court, on remand, took new evidence and made new findings of fact as to damages), *cert. denied*, 446 U.S. 936 (1980); *Hysell v. Iowa Pub. Serv. Co.*, 559 F.2d 468, 476 (8th Cir. 1977) (same where prior judgment "expressly vacated on appeal as legally insufficient").

The reasoning of these cases aligns with the text of Section 1961(a): Where a plaintiff must prove his factual and legal entitlement to damages anew in a second trial, he can no longer point to the original judgment as evidence that he has "recovered" a "money judgment." 28 U.S.C. § 1961(a). That earlier judgment thus retains no significance under the statute. *See, e.g.*, *Johansen*, 170 F.3d at 1339 ("Where the judgment is not supported by the evidence and is vacated and damages are determined by a new trial, the damages were not 'ascertained' in any meaningful way until the entry of the second judgment" (citations omitted)). But crucially, in line with the reasoning of *Kneeland II*, what is doing the work in these cases is *not* the fact that the initial judgment has been vacated, but rather that the appellate decision, often a vacatur, reflected the court's determination that the factual and legal bases for the original judgment were deficient. *See Lewis*, 99 F.3d at 545-46.

### 3.     This Court's Decisions Adhere to These Principles.

Taken together, the cases just discussed  hold that "where a first judgment lacks an evidentiary or legal basis, post-judgment interest [under Section 1961(a)] accrues from the date of the second judgment; [but] where the original judgment is basically sound [and] is [merely] modified on remand, post-judgment interest accrues from the date of the first judgment." *Cordero v. De Jesus-Mendez*, 922 F.2d 11, 16 (1st Cir. 1990).  None of this Court's cases holds otherwise.

The district court relied on this Court's decision in *Divane v. Krull Electric Co.* (*Divane II*), 319 F.3d 307 (7th Cir. 2003), but that case supports Epic's position, not TCS's.  In *Divane II*, the district court awarded the plaintiffs around $35,000 in attorneys' fees and costs as a Rule 11 sanction—an amount representing "all attorney's fees and expenses incurred" by the plaintiffs after the sanctionable conduct occurred.  *Id.* at 312.  In the first appeal, this Court explained that Rule 11 permits fee shifting as a sanction only to the extent that expenses are incurred as a "direct[] result [of] a party or attorney's sanctionable conduct," *Divane v. Krull Elec. Co., Inc.* (*Divane I*), 200 F.3d 1020, 1030-31 (7th Cir. 1999), so it vacated the district court's "blanket award of attorney's fees and costs" because it "necessarily included some amount that did not directly result from [the] sanctionable conduct," *Divane II*, 319 F.3d at 309.  On remand, the district court's task was to "determine," as a matter of fact, "which ... legal costs [we]re the direct result of [the] sanctionable conduct" and enter a new award in that amount, *Divane I*, 200 F.3d at 1031.

The district court subsequently made new factual findings and entered a new judgment reducing its award to around $20,000, *see Divane II*, 319 F.3d at 313, and another appeal ensued. In a second appeal, this Court upheld the methodology the district court employed to determine which expenses resulted from the misconduct, *id.* at 314-17, but found that the baseline figure the district court used as part of its calculations was $4,800 too high, an error that impacted the remainder of its calculations, *id.* at 318-20. Rather than vacating and remanding for the district court to correct that error, this Court performed the analysis itself using the new, lower baseline figure, and concluded that an award of around $16,000 was appropriate. *Id.* at 318-20, 318 n.2. The Court affirmed the judgment "as [so] modified" and held that post-judgment interest should run from the date on which the district court, on remand from *Divane I*, entered judgment on its (since-reduced) $20,000 award. *Id.* at 321-22 (capitalization altered).

*Divane II* illustrates where each side of the Section 1961(a) line lies. *First*, post-judgment interest did not run from the district court's first judgment, as the initial award embodied in that judgment was both legally unsound (because it misinterpreted the scope of permissible sanctions under Rule 11) and factually unsound (because it absolved the plaintiffs of their burden to prove that the sanctionable conduct caused them to incur additional attorneys' fees). Because *Divane I* thus determined that the original judgment both "lack[ed] a legal basis [and] require[d] further factual development," that judgment was "a nullity" for purposes of Section 1961(a). *Lewis*, 99 F.3d at 545.

33

*Second*, post-judgment interest *did* run from the judgment that reflected the correct legal framework and sufficient proof of causation *but was nonetheless excessive*. This Court's decision to run post-judgment interest from the second, incorrectly-calculated fee award, *see Divane II*, 319 F.3d at 318, reflects a recognition that what matters for purposes of Section 1961(a) is the point at which the prevailing party's *entitlement* to damages is established as a matter of fact and law, *see, e.g.*, *Exxon*, 568 F.3d at 1080, *not* the point at which the precise amount of damages owed is finally fixed. Because the district court's $20,000 judgment was "correct to the extent of $[16,000]," *Johansen*, 170 F.3d at 1340, interest on that $16,000 began to accrue on the date the district court entered its $20,000 judgment, *see Divane II*, 319 F.3d at 322.

This Court's other Section 1961(a) case on which the district court relied, *Harris v. Chicago Great Western Railway Co.*, 197 F.2d 829 (7th Cir. 1952), is much the same. The parties in *Harris* entered into a settlement agreement under which the defendant agreed to pay the plaintiffs' reasonable attorney's fees, as determined by the court. *Id.* at 831. When the district court awarded $500,000 in fees, the defendant appealed, arguing that, "in fixing the fees, the court improperly took into consideration the merits of the litigation." *Id.* at 830. This Court agreed, holding that the district court improperly made and relied upon "findings of fact [as to] the merits of plaintiffs' claims," and that, "[t]o the extent that this factor entered into the court's disposition [of the fee petition], error resulted." *Id.* at 832-33. Rather than remand for the district court to recalculate fees, this Court exercised its discretion to do so itself, setting the award at

34

$350,000.  *Id.*  The Court then vacated the judgment, remanded with directions to enter a new judgment for $350,000, and held that interest would begin to accrue only from the entry of that new judgment.  *Id.* at 836.

Under Section 1961(a), interest could not accrue from the district court's original judgment, which this Court found to be "interwoven with erroneous conceptions"—among them, the district court's legally improper consideration of the merits in the case.  *Id.* at 835.  That error infected the entire proceeding and distinguishes *Harris* from the cases in which a "basically sound" original judgment is simply "modified" following an appeal, *Cordero*, 922 F.2d at 16; *see, e.g., Divane II*, 319 F.3d at 318.  Instead, *Harris* is a case in which the "first judgment ... lack[ed] a [valid] legal basis" and thus "should be treated as a nullity" for post-judgment interest purposes, *Lewis*, 99 F.3d at 545.

*Divane II* and *Harris* therefore align with the principles reflected in Section 1961(a)'s text, historical context, and purpose: Post-judgment interest begins to accrue from the date of entry of the judgment that first establishes, as a matter of fact and on a valid theory of law, the plaintiff's entitlement to collect money damages.  From that point forward, subsequent developments that merely reduce the amount of damages owed without undermining the evidentiary and legal bases for the plaintiff's entitlement to damages do not restart the clock under Section 1961(a).  *See Divane II*, 319 F.3d at 318, 322.

## II.     EPIC IS ENTITLED TO RECEIVE POST-JUDGMENT INTEREST FROM THE DATE OF THE ORIGINAL JUDGMENT.

Interest in this case began to accrue on October 3, 2017, when the district court entered the original judgment following the jury's verdict.  *See* A12-17.

From that point forward, the factual and legal underpinnings of Epic's entitlement to collect punitive damages have been repeatedly and uniformly affirmed. While this Court's decision in *Epic I* reduced the *amount* of the jury's punitive-damages award, it did not call into question the factual or legal basis for Epic's entitlement to an award of punitive damages. The district court thus erred when it determined that it was required to run post-judgment interest from the date of entry of the amended judgment, effectively allowing TCS to enjoy an interest-free loan of $140 million for nearly five years.

**A.     Because *Epic I* Left Intact the Factual and Legal Bases of the Jury's Award, the District Court Erred in Concluding That Later Proceedings Altered the Relevant Date Under Section 1961(a).**

The original October 3, 2017 judgment in Epic's favor was a "money judgment ... recovered in a district court" entitling Epic to collect post-judgment interest. 28 U.S.C. § 1961(a). The only question, therefore, is whether the subsequent proceedings in this case stripped that initial judgment of its significance under the statute. The district court held that *Epic I*'s decision to vacate the punitive-damages award for entry of a reduced award on remand had that effect. That conclusion was error.

**1.     *Epic I* Affirmed Epic's Legal Entitlement to Collect Punitive Damages and Did Not Question the Jury's Factual Findings.**

This Court's decision in *Epic I* left undisturbed the factual and legal premises of the jury's punitive-damages award, so it did not restart the clock under Section 1961(a). Indeed, TCS made no argument in either appeal that the record evidence did not support the jury's liability verdicts. *See* R.1040 at 2

36

("TCS ... did not dispute [its] misconduct on appeal."). There was thus no question before the Court in *Epic I* that TCS had misappropriated Epic's trade secrets, made fraudulent misrepresentations, and engaged in unfair competition—the three of Epic's claims authorizing an award of punitive damages under Wisconsin law. *See Epic I*, 980 F.3d at 1128.

With the factual premises of the jury's award uncontested, this Court next rejected each of TCS's challenges to the award's legal underpinnings. It held that (1) "Wisconsin law [did not] require[] Epic to prove an 'actual injury' to obtain punitive damages"; (2) the jury did not impermissibly base its punitive-damages award on Epic's unjust enrichment claim, but rather on Epic's three claims that *did* "support punitive damages"; and (3) the district court's vacatur of part of the compensatory-damages award did not undermine the jury's decision to award punitive damages to punish TCS's misconduct. *Id.* at 1138-40.

In the decision under review, the district court recognized all of this, explaining that this Court "held [in *Epic I*] ... that there *was* a legal basis for a punitive damages award and ample evidence at trial supported that award." A6. But the court failed to recognize the significance of those conclusions: Having disposed of each of TCS's arguments that the jury lacked authority or sufficient evidence to award punitive damages, *Epic I* stands as an affirmance, "*pro tanto*," *Kneeland II*, 138 U.S. at 511, of "the evidentiary basis ... [and] the legal foundation for [the jury's] award," *Exxon*, 568 F.3d at 1080, and thus an affirmance of Epic's "recover[y]" of a "money judgment" under Section 1961(a). In other words, *Epic I* confirms that Epic's "entitlement to punitives was

'meaningfully ascertained' when the original district court judgment was entered." *Exxon*, 568 F.3d at 1080. Post-judgment interest therefore began to accrue on the date of entry of that judgment—October 3, 2017.

      **2.**    **Neither *Epic I*'s Application of a Constitutional Limit on the Amount of Punitive Damages Nor Its Vacatur and Remand to the District Court Restarted the Clock Under Section 1961(a).**

This Court in *Epic I* granted TCS relief on its argument that even if punitive damages were authorized, the $280 million award here exceeded the "substantive limits on the size of punitive damages awards" that "[t]he Due Process Clause … imposes," *Epic I* Dkt. 19 at 63 (TCS Opening Br.); *see Epic I*, 980 F.3d at 1137, 1140, concluding that the Due Process Clause capped punitive damages in this case at $140 million, *Epic I*, 980 F.3d at 1140-45.

Contrary to the district court's conclusion, *see* A6-8, neither that due process analysis nor the Court's decision to vacate and remand for the district court to reenter a new punitive-damages award stripped the district court's original money judgment of its status under Section 1961(a). *Epic I* did not hold that the district court's judgment "lack[ed] an evidentiary or legal basis," *Cordero*, 922 F.2d at 16; to the contrary, as just discussed, this Court's decision *affirmed* the factual and legal bases for the jury's punitive-damages award, *see* pp. 36-38, *supra*. Instead, this is a case in which a "basically sound" original judgment was "modified" by subsequent proceedings. *Cordero*, 922 F.3d at 16. Looking to the "substance" of the proceedings in this case, *Kneeland II*, 138 U.S. at 511-12, the district court's original judgment was deemed "correct to the extent of $[140] million," *Johansen*, 170 F.3d at 1340, and that amount

"embraced in the [original judgment]" was "incorporated into the [amended judgment]," *Kneeland II*, 138 U.S. at 511.   Epic is therefore entitled under Section 1961(a) to post-judgment interest calculated from the date of entry of that original judgment.

<blockquote>

a.    **The Court's Holding in *Epic I* That the Due Process Clause Capped Punitive Damages Did Not Affect Epic's Entitlement to Collect Interest From the Date of the Original Judgment.**

</blockquote>

*Epic I*'s due process analysis did not undermine the legal or factual basis for Epic's entitlement to punitive damages.  Far from it.  In analyzing the first *Gore* factor—the "reprehensibility of the defendant's conduct"—this Court concluded that TCS's multiyear pattern of "wrongful," "intentional[,] and deceitful" conduct "warrant[ed] punishment" in the form of punitive damages. *Epic I*, 980 F.3d at 1140-42.  That conclusion makes this case just like the others in which "the initial judgment is [deemed to be] supported by the evidence and the later judgment merely reflects a remittitur of a certain portion of that judgment as excessive." *Johansen*, 170 F.3d at 1339.  Here, as in those cases, the original judgment is "correct to the extent it is permitted to stand, [so] interest on [that] judgment partially affirmed should be computed from the date of its initial entry." *Id.* at 1340.

In *Johansen*, the Eleventh Circuit observed that this reasoning is "especially applicable in the context of a constitutionally excessive verdict." *Id.* That is true because, by definition, a due process reduction in punitive damages cannot implicate the factual or legal validity of the underlying judgment.  "[T]he level of punitive damages is not really a 'fact' 'tried' by the jury," but "an

expression of [the jury's] moral condemnation." *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 432, 437 (2001) (citation omitted). Accordingly, a court assessing whether a punitive-damages award comports with due process has before it only one question—whether the degree of that "moral condemnation," *id.*, is so "grossly excessive," *Epic I*, 980 F.3d at 1140 (citation omitted), that it "deprives the [defendant] of property without due process of law," *Saccameno v. U.S. Bank Nat'l Ass'n*, 943 F.3d 1071, 1078 (7th Cir. 2019).

As the Supreme Court explained in *Dimick v. Schiedt*, "[w]here the verdict is excessive" and the court enters a remittitur, "what remains [of the damages] is included in the [original] verdict along with the unlawful excess .... [T]he remittitur has the effect of merely lopping off an excrescence." 293 U.S. 474, 486 (1935). So too here. A court assessing a punitive-damages award under the *Gore* framework takes the jury's moral condemnation as a given, determines the extent to which it comports with due process, "stri[kes]" the "clearly identifiable excessive portion," *Johansen*, 170 F.3d at 1340, affirms the constitutional portion of the award "*pro tanto*," and orders the constitutional part of the damages "embraced in the former decree[] ... to be incorporated into the new," *Kneeland II*, 138 U.S. at 511. That process does not change the relevant judgment under Section 1961(a): The plaintiff "recovered" its "judgment" for punitive damages, 28 U.S.C. § 1961(a), when it secured the original judgment.

While *Epic I* "lopp[ed] off" "the unlawful excess" of the original verdict, "what remain[ed]"—$140 million—was undeniably a component of the jury's original verdict. *Dimick*, 293 U.S. at 486. Put another way, $140 million of the

jury's punitive-damages verdict was constitutional the day the verdict was handed down, *see id.*, and the verdict was "correct to th[at] extent," *Johansen*, 170 F.3d at 1340. Accordingly, post-judgment interest accrues from the date of entry of the judgment embodying that verdict—October 3, 2017.

> **b.** **The District Court Erred in Holding That *Epic I*'s Decision to Vacate and Remand Changed the Relevant Judgment for Purposes of Section 1961(a).**

The foregoing analysis left TCS—and the district court—to rely on a single fact: This Court, after determining that the Due Process Clause capped punitive damages at $140 million, did not itself enter judgment in that new amount, but instead "vacated" and remanded for the district court "to amend its judgment and reduce punitive damages to, at most, $140 million." *Epic I*, 980 F.3d at 1145-46 (capitalization altered). In the district court's view, in that procedural posture, "the legal and factual bases for the court's punitive damages award w[ere] … *not* meaningfully ascertained until after [the district] court considered the due process factors on remand." A7. In reaching that conclusion, the district court distinguished Epic's cases—primarily *Johansen* and *Exxon*—and deemed this case "more similar to" *Harris* and *Divane II*. A6-8.

Those conclusions were erroneous. Neither this Court's decision to vacate the judgment, nor its conferral of discretion to the district court on remand, stripped the district court's original judgment of its status under Section 1961(a). And in reaching those conclusions, the district court misread the relevant precedents.

*Vacatur.*   The district court's analysis misapprehends the significance of the vacatur.  As discussed, *see* pp. 27-30, *supra*, courts across the country have consistently held that post-judgment interest accrues from the date of entry of vacated judgments where the vacatur did not result from a court's determination that the original judgment "lack[ed] a legal basis or require[d] further factual development."  *Lewis*, 99 F.3d at 545; *see Johansen*, 170 F.3d at 1339-40; *Exxon*, 568 F.3d at 1080; *Dunn*, 13 F.3d at 60-62; *Tinsley*, 979 F.2d at 1383; *Coal Res.*, 954 F.2d at 1274-75; *N. Nat. Gas*, 818 F.2d at 737-38.   And, recognizing that reductions to excessive punitive-damages awards do not call into question the factual or legal basis of the jury's award, *see* pp. 39-41, *supra*, courts uniformly hold that such reductions do not change the relevant judgment for purposes of Section 1961(a).  *See Johansen*, 170 F.3d at 1339-40; *Exxon*, 568 F.3d at 1080; *Dunn*, 13 F.3d at 60-62.

Under that unbroken line of precedents, the "vacated" label this Court employed in *Epic I* is "immaterial."  *Kneeland II*, 138 U.S. at 511-12.  As these cases recognize, what matters is that this Court's decision affirmed the original punitive-damages judgment in "substance," *id.*, "to the extent of" the $140 million "permitted to stand."  *Johansen*, 170 F.3d at 1340.  In *Johansen*, *Exxon*, and *Dunn*, there was an intervening vacatur.  Yet those courts still held that post-judgment interest under Section 1961(a) accrued from the date of the original judgment.  This Circuit should not create a conflict with other Circuits by being the first to hold otherwise.  *See* Cir. R. 40(e).

42

*Conferral of Discretion on Remand.*    Nor is it significant that this Court in *Epic I* remanded with instructions to enter a punitive-damages award of "at most, $140 million."  980 F.3d at 1145.  The district court understood that language as requiring it to "again consider the legal and evidentiary issues on remand," and held that, as a result, interest could no longer accrue from the date of the original judgment.  A7-8.

That reasoning is incorrect.  Again, a due process reduction of a punitive-damages award will *never* involve calling into question the factual or legal basis of the jury's original award.  *See* pp. 39-41, *supra.*  And because the allowable level of punitive damages is "a question of law," *Saccameno*, 943 F.3d at 1092, deciding that question will also never "require[] further factual development," *Lewis*, 99 F.3d at 545, so the court of appeals can always elect to simply order the entry of judgment for the correct amount on appeal.  Accordingly, courts hold that the vacatur of a punitive-damages award on constitutional grounds does not restart the clock under Section 1961(a), *regardless* of whether the reduction is ordered by the court of appeals in the first instance, *see Dunn*, 13 F.3d at 60 (court of appeals reduced punitive damages on appeal), or the district court on remand, *see Johansen*, 170 F.3d at 1327 (district court applied *Gore* factors in the first instance on remand from decision vacating award).

Thus, even had the district court agreed with TCS and entered an award of less than $140 million on remand (supposing it could do so),[6] the result for

---

[6] As Epic argued below, the district court on remand from *Epic I* lacked authority to further reduce the punitive-damages award here since this Court had already

purposes of Section 1961(a) would have been the same: The original verdict would be "correct to the extent" allowed on remand and interest would accrue from the original judgment embodying that verdict. *Johansen*, 170 F.3d at 1340. This Court in *Epic I* reached the due process question only after establishing that the jury's punitive-damages award was factually sound and authorized under Wisconsin law. *See* 980 F.3d at 1137-40. At that point, the Court had before it only one question: "[T]o [what] extent [are those damages] permitted to stand"? *Johansen*, 170 F.3d at 1340. Whatever the answer to that question—and regardless of whether this Court or the district court answered it in the first instance—the result is "*pro tanto* an affirmance" of a portion of the original judgment on the jury's verdict. *Kneeland II*, 138 U.S. at 511. Post-judgment interest therefore runs from that original judgment. Ascribing dispositive significance to this Court's decision not to exercise its discretion to award $140 million in *Epic I* and affirm the judgment "as [so] modified," *Divane II*, 319 F.3d at 322 (capitalization altered), but rather to vacate and remand, improperly elevates "form" over "substance," *Kneeland II*, 138 U.S. at 511-12.

> _Precedent._ The district court's resort to precedent similarly falls flat. *Johansen* and *Exxon* are on all fours with this case. In both cases, the courts held that post-judgment interest accrued on earlier punitive-damages judgments

---

concluded that a $140 million award was constitutional and every remaining nonconstitutional challenge to the award had either been decided by this Court in *Epic I* or waived. R.1041 at 3-4. Moreover, as the Eleventh Circuit noted in *Johansen*, a reduction in a punitive-damages award *below* "the maximum permitted by the Constitution … would invade the province of the jury." 170 F.3d at 1331 n.16.

later vacated as excessive, just as the judgment in this case was.  *See Johansen*, 170 F.3d at 1338-40 (judgment vacated under the *Gore* factors); *Exxon*, 568 F.3d at 1080 (judgment vacated under similar admiralty-law principles); *see also Dunn*, 13 F.3d at 60-62 (pre-*Gore* case in which judgment vacated on federal due process grounds).  But the district court distinguished *Exxon* because "the Ninth Circuit entered a specific punitive damage award as stipulated by the parties" and *Johansen* because "the Eleventh Circuit affirmed the damages award already entered by the district court."  A6.  These statements are non sequiturs.  The Ninth Circuit in *Exxon* did not rely on the parties' stipulation, *see* 568 F.3d at 1079-81, and a stipulation entered into in 2009 could not render damages "meaningfully ascertained" as of 1996, *id.* at 1080.  And while the Eleventh Circuit in *Johansen* affirmed the district court's award of punitive damages, the district court's *initial* award was vacated by the Supreme Court.  *See* 170 F.3d at 1327.  Yet *Johansen* held that interest accrued from the date of that first, since-vacated judgment, not the reduced judgment entered on remand that it ultimately affirmed.  *See id.* at 1339-40.

The district court fared no better when it turned to this Court's decisions. *Harris* and *Divane II* held that interest did not accrue on judgments vacated because they "lack[ed] a legal basis or require[d] further factual development." *Lewis*, 99 F.3d at 545; *see Harris*, 197 F.2d at 836; *Divane II*, 319 F.3d at 322. Here, however, the original judgment did *not* lack legal basis or require further factual development.  *See* pp. 36-41, *supra*.  Moreover, the district court did not acknowledge that *Divane II*, which ran interest from the date of a prior judgment

reduced on appeal, *see* 319 F.3d at 322, also illustrates the principle that "[w]here the initial judgment is supported by the evidence and the later judgment merely reflects a remittitur of a certain portion of that judgment as excessive, … post-judgment interest should run from the date of the original judgment." *Johansen*, 170 F.3d at 1339-40 (collecting cases).

That is precisely what happened in this case. As the district court itself recognized when directing the clerk to file the "amended final judgment," while "[t]he jury's award of punitive damages [was] [ultimately] reduced to $140 million …[,] [i]n all other respects, the court's original, final judgment remain[ed] unchanged." R.1045 at 8. While *Epic I* and the district court proceedings on remand resulted in the "lopping off" of "the unlawful excess" in the original judgment, *Dimick*, 293 U.S. at 486, they ultimately determined that that original judgment was "correct to the extent of $[140] million," *Johansen*, 170 F.3d at 1340. That original judgment should thus be treated as having been "partially affirmed" in that amount, *id.*; *see Kneeland II*, 138 U.S. at 511, such that it remains the relevant "money judgment" for purposes of 28 U.S.C. § 1961(a). Post-judgment interest in this case therefore accrues from the date of entry of that initial judgment.

### B.   A Contrary Result Would Award TCS a Windfall, Undermining the Purpose of Section 1961(a).

More than twelve years ago, TCS embarked on a yearslong scheme to "st[eal] thousands of Epic's documents, lie[] about it, cover[] it up, and use[] Epic's information in a variety of ways." *Epic I*, 980 F.3d at 1140. TCS's actions were "intentional and deceitful, not [merely] negligent." *Id.* at 1142.

46

In 2016, a jury "adjudicated [TCS a] wrongdoer," *Merit Ins.*, 728 F.2d at 945, and, exercising its authority under Wisconsin law, expressed its "moral condemnation" of TCS's actions, *Cooper Indus.*, 532 U.S. at 432, by awarding punitive damages. The district court entered judgment on that verdict in October 2017, *see* A12-17, but Epic did not receive the punitive-damages award until December 2023—more than six years later, *see* R.1063 at 4. Throughout that six-year period, the factual and legal bases for Epic's entitlement to punitive damages were repeatedly affirmed, and Epic's "position on the merits ... vindicated." *Merit Ins.*, 728 F.2d at 945. The only question on which TCS obtained relief was whether the Due Process Clause required a reduction in the amount of that damages award—a question that took roughly five years to answer.

TCS seeks to profit from that delay, just as it sought to profit from its theft of Epic's trade secrets. It asks this Court to hold that, for five of the six years during which TCS was an "adjudicated wrongdoer," it was entitled to "enjoy, interest free, [$140 million] that rightfully belonged to [Epic]," *id.*, the "successful plaintiff," *Kaiser*, 494 U.S. at 835-36 (quotation omitted). By having use of that $140 million for those five years, TCS likely reaped benefits of several hundred million dollars—far exceeding the interest allowed under Section 1961(a), however calculated. *See* R.1044 at 3-4; R.1063 at 4.

There is "no reason why [Epic] should be disadvantaged in the calculation of interest [just] because the jury overestimated [its] damages." *Dunn*, 13 F.3d at 61. That result would not only contravene the text of Section 1961(a) and the

uniform case law applying it—it would also undermine the purpose of the post-judgment interest statute. It was TCS "whose initial wrongful conduct invoked the judicial process and who has had the use of the money judgment throughout the period of delay." *Perkins v. Standard Oil Co. of Cal.*, 487 F.2d 672, 676 (9th Cir. 1973). It is therefore TCS that must pay post-judgment interest to compensate Epic "for the loss from the time between the ascertainment of the damage [in 2017] and the payment by the defendant" in 2023. *Kaiser*, 494 U.S. at 835-36 (quotation omitted).

## CONCLUSION

For the foregoing reasons, Epic respectfully requests that the Court reverse the judgment of the district court and remand with instructions that Epic be awarded post-judgment interest accruing from October 3, 2017.

Respectfully submitted,

EPIC SYSTEMS CORPORATION

By /s/Kathryn L. Wynbrandt
One of Its Attorneys

Michael T. Brody
  *Counsel of Record*
Simon A. de Carvalho
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
(312) 222-9350
mbrody@jenner.com
sdecarvalho@jenner.com

Kathryn L. Wynbrandt
JENNER & BLOCK LLP
1099 New York Avenue NW,
  Suite 900
Washington, DC 20001
(202) 639-6000
kwynbrandt@jenner.com

Kristin G. Noel
QUARLES & BRADY LLP
33 East Main Street,
  Suite 900
Madison, WI 53703
(608) 251-5000
kristin.noel@quarles.com

*Attorneys for Plaintiff-Appellant*
*Epic Systems Corporation*

Dated:  January 13, 2025

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(c) because, according to the word count function of Microsoft Office Word 365, this brief contains 12,912 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 12 point Bookman Old Style for the main text and footnotes.

Dated:  January 13, 2025

/s/ Kathryn L. Wynbrandt
Kathryn L. Wynbrandt

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), I, Kathryn L. Wynbrandt, an attorney, certify that all materials required by Circuit Rule 30(a) and 30(b) are included in Plaintiff-Appellant's Required Short Appendix.

Dated:  January 13, 2025

/s/ Kathryn L. Wynbrandt
       Kathryn L. Wynbrandt

**CERTIFICATE OF SERVICE**

I, Kathryn L. Wynbrandt, an attorney, hereby certify that on January 13, 2025, I caused the **Brief And Required Short Appendix Of Plaintiff-Appellant Epic Systems Corporation** to be electronically filed with the Clerk of the Court for the United States Court Of Appeals for the Seventh Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Pursuant to ECF procedure (h)(2) and Circuit Rule 31(b), and upon notice of this Court's acceptance of the electronic brief for filing, I certify that I will cause 15 copies of the above named brief to be transmitted to the Court via UPS overnight delivery, delivery charge prepaid, within five days of that date.

/s/Kathryn L. Wynbrandt
Kathryn L. Wynbrandt

## INDEX OF REQUIRED SHORT APPENDIX

Opinion and Order, No. 14-cv-00748, *Epic Systems Corp. v. Tata Consultancy Services Ltd. et al.* (W.D. Wis.) (Sept. 23, 2024) (R.1065)..................................................................A1

Amended Judgment in a Civil Case, (July 12, 2022) (R.1046)...............................................................A10

Judgment in a Civil Case, (Oct. 3, 2017) (R.978) ...................................................................A12

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

EPIC SYSTEMS CORPORATION,

|  |  |  |
|---|---|---|
| | Plaintiff, | OPINION AND ORDER |
| v. | | 14-cv-748-wmc |
| TATA CONSULTANCY SERVICES LIMITED and TATA AMERICA INTERNATIONAL CORPORATION d/b/a TCA America, | | |
| | Defendants. | |

---

Plaintiff Epic Systems Corporation has moved for an award against defendants Tata Consultancy Services Limited and Tata America International Corporation for post-judgment interest on the punitive damage portion of the judgment in this case. Defendants concede that plaintiff is entitled to post-judgment interest, but dispute when that interest began to run. Specifically, plaintiff asserts that interest should run from the date of the original judgment entered on October 3, 2017, while defendants argue that the amended judgment entered by this court after remand from the Seventh Circuit on July 12, 2022, is the relevant date. Thus, the remaining question for this court on remand is whether plaintiff's punitive damage award of $140 million could be "ascertained in a meaningful way" on October 3, 2017, or whether the evidentiary and legal basis for the award was not ascertainable until this court revised the amount of the punitive damage award on July 12, 2022.

Because the Seventh Circuit capped the punitive damage award at $140 million but remanded for this court to determine the actual amount to be awarded, the court agrees

with defendants that the punitive damage award was not yet ascertained in a meaningful way until determined by this court's entry of final judgment on July 12, 2022. Accordingly, plaintiff will be awarded $5,613,146.34 in post-judgment interest, which is calculated based on 2.86% interest rate applicable to judgments entered the week of July 12, 2022.

## BACKGROUND

Following a multi-week trial, a jury originally awarded plaintiff $240 million in compensatory damages and $700 million in punitive damages. In response to motions after the verdict, this court later reduced the compensatory damages award to $140 million, holding that a $100 million portion of the compensatory damages award was not supported by sufficient evidence. Consistent with a Wisconsin statute that caps punitive damages at two times compensatory damages, the court also reduced the punitive damage award to $280 million, and entered a final judgment in that amount on October 3, 2017. (Dkt. #978.) Defendants then appealed the remaining compensatory and punitive awards, while plaintiff cross-appealed the court's vacatur of the $100 million compensatory award.

On appeal, the Seventh Circuit affirmed the $140 million compensatory damage award and this court's vacatur of the additional $100 million compensatory award, but vacated the $280 million punitive damage award. *Epic Systems Corp. v. Tata Consultancy Services Ltd.*, 980 F.3d 1117 (7th Cir. 2020). With respect to punitive damages, the Seventh Circuit held that an award of $280 million exceeded federal due process limits because defendants' "conduct, while reprehensible, was not egregious," especially since defendants were already subject to a substantial compensatory award. *Id.* at 1144.

The Seventh Circuit also noted that defendants' conduct did not involve a risk of physical harm -- to plaintiff or anyone else -- but only economic harm. *Id.* at 1141. Further, as the Seventh Circuit explained, "if Epic suffered *quantifiable* economic harm, that harm is significantly smaller than $140 million." *Id.* at 1143 (emphasis added). Under these circumstances, therefore, the Seventh Circuit held that a 1:1 ratio of compensatory to punitive damages was the *maximum* award federal due process would allow, and it remanded for this court to "amend its judgment and reduce punitive damages to, *at most*, $140 million." *Id.* at 1144-45 (emphasis added).

On remand, this court ultimately "conclude[ed] that the facts and circumstances of this case as a whole justify an award of $140 million in punitive damages." Consistent with that ruling, the clerk of court entered a second amended final judgment on July 12, 2022. (Dkt. #1045.) While defendants appealed again, arguing that $140 million was excessive, the Seventh Circuit affirmed on July 14, 2023, concluding that this court had "properly justified the $140 million punitive damages award." *Epic Systems Corp. v. Tata Consultancy Services Ltd.*, 2023 WL 4542011, at *2 (7th Cir. July 14, 2023). Plaintiff then filed this motion for an award of post-judgment interest on top of the $140 punitive damage from the date of the original judgment entered on October 3, 2017.[1]

---

[1] Defendant has already paid plaintiff compensatory damages, post-judgment interest on compensatory damages and punitive damages.

OPINION

Post-judgment interest "shall be calculated from the date of the entry of the judgment." 28 U.S.C. § 1961. When there are multiple judgments entered, as in this case, post-judgment interest accrues from the date of the judgment for which damages could be "ascertained in any meaningful way." *Kaiser Aluminum* & *Chemical Corp. v. Bonjorno*, 494 U.S. 827, 835–36 (1990); *see also Transmatic, Inc. v. Gulton, Indus., Inc.*, 180 F.3d 1343, 1349 (Fed. Cir. 1999). Thus, if "a first judgment lacks an evidentiary or legal basis, post-judgment interest accrues from the date of the second judgment." *Cordero v. De Jesus–Mendez*, 922 F.2d 11, 16 (1st Cir. 1990). However, "[w]here an original judgment is upheld for the most part but modified on remand, post-judgment interest should accrue from the date of the first judgment." *Id.* at 17.

Neither side cites a Supreme Court or Seventh Circuit that *directly* addresses the question whether a punitive award later vacated on constitutional grounds and remanded for redetermination was nevertheless "meaningfully ascertainable" on the date of the original judgment. Instead, plaintiff cites three nonprecedential cases in support of its argument that its punitive damage award was meaningfully ascertainable on the date of the original judgment, October 3, 2017. First, it cites the Ninth Circuit's discussion in *Exxon Valdez v. Exxon Mobil*, 568 F.3d 1077 (9th Cir. 2009), a case that was remanded after the United States Supreme Court had vacated a punitive award because relevant admiralty law required the award to be capped at a 1:1 ratio to compensatory damages. Even though two, earlier punitive damages awards had been vacated in the same case for different reasons, the Ninth Circuit nevertheless held on remand that post-judgment interest should

4

run from the date of the original judgment. *Id.* at 1080. In particular, because the "evidentiary and legal bases" for plaintiffs' punitive damage award were "meaningfully ascertained" as of the date of the original judgment, the court held that interest on the final award dictated by the United States Supreme Court on remand should run from that same date. The court further held that subsequent reductions on appeal of an award of punitive damages should not affect the date from which post-judgment interest runs, given that "[n]either the evidentiary basis for the award nor the legal foundation for an award has been disturbed after nearly a dozen years of subsequent litigation." *Id.*

Second, plaintiff cites *Johansen v. Combustion Engineering, Inc.*, 170 F.3d 1320 (11th Cir. 1999), in which the Eleventh Circuit had to determine whether post-judgment interest on a punitive damage award began with a larger, original judgment or a later remitted judgment. The Eleventh Circuit held that post-judgment interest ran from the original judgment in that case, because "[w]hen an original judgment is not completely vacated, the date from which post-judgment interest runs turns on the degree to which the original judgment is upheld or invalidated." *Id.* at 1339.

Third, plaintiff cites *C.R. Bard, Inc. v. M3 Systems, Inc.*, 120 F. Supp. 2d 1145 (N.D. Ill. 2000), a case on remand after the Federal Circuit had affirmed on liability on one count but vacated the damages award for the purpose of determining if one of the claims could be segregated. On remand, the court held that post-judgment interest accrued from the date of the first judgment on the portion of the damage award affirmed on appeal, because there was "no issue as to the sufficiency of the evidence underlying the verdict." *Id.* at 1150.

5

A5

Plaintiff contends that the same reasoning from these three cases applies here.  In particular, the Seventh Circuit held on its first review of this case on appeal that there *was* a legal basis for a punitive damages award and ample evidence at trial supported that award.  Plaintiffs note that the Seventh Circuit also rejected several of defendants' arguments opposing the award, and it did not remand the case so that the court could calculate an award based on a different method or additional evidence.  Rather, plaintiff argues, the punitive damage award was meaningfully ascertainable and remanded solely because the ratio between compensatory and punitive damages exceeded the 1:1 federal due process limitation.

However, plaintiff fails to acknowledge the legal and factual distinctions between this case and *Exxon*, *Johansen* and *C.R. Bard, Inc.*  In *Exxon*, the Ninth Circuit entered a specific punitive damage award as stipulated by the parties; in *Johansen*, the Eleventh Circuit affirmed the damages award already entered by the district court; and in *C.R. Bard*, the Federal Circuit remanded the case for the limited purpose of determining whether a damages award could be apportioned between claims, not because the amount had yet to be determined.  In contrast, the Seventh Circuit here *vacated* the punitive damage award and directed this court to reduce the award because the "facts and circumstances of this case" did *not* justify the original award.  *Epic*, 980 F.3d at 1144.  Nor did the Seventh Circuit dictate the amount of that award on remand, but rather permitted an award of "at most" $140 million in punitive damages.  Following the Seventh Circuit's instructions, this court on remand considered the relevant evidence, including its compensatory damages award and defendant's conduct in light of the constitutional considerations articulated by

6

A6

Supreme Court and Seventh Circuit, ultimately concluding that a punitive damage award of $140 million was appropriate.  (Dkt. #1045.)  Thus, the legal and factual bases for the court's punitive damages award was arguably *not* meaningfully ascertained until after this court considered the due process factors on remand.

Because the Seventh Circuit's mandate required this court to again consider the legal and evidentiary issues on remand, the court is inclined to agree with defendants that this case is more similar to two Seventh Circuit cases.  In *Divane v. Krull Electric Co.*, 319 F.3d 307 (7th Cir. 2003), the Seventh Circuit vacated a "blanket" award of attorneys' fees by the district court to the prevailing party as a sanction for misconduct by one of the attorneys for the losing party.  The Seventh Circuit further noted that the district court had failed to ascertain the attorneys' fees that the prevailing party actually incurred as a result of the misconduct at issue.  *Id.* at 309.  Finally, on a later appeal from the recalculated attorneys' fees award, the court of appeals held that post-judgment interest should run from the date that the district court entered its post-remand judgment, finding that the original judgment had *not* been supported by evidence of the specific damages to which the prevailing party was entitled because of misconduct by the opponent's attorney.  *Id.* at 322 (citing *Kaiser*, 494 U.S. at 835–36).

Similarly, in *Harris v. Chicago Great Western Railway Co.*, 197 F.2d 829, 836 (7th Cir. 1952), the district court had awarded $500,000 in attorney's fees as part of its initial judgment.  On appeal, the Seventh Circuit concluded that "[t]his determination was erroneous," and directed the district court to enter judgment for $350,000 in fees on remand.  *Id.*  More importantly for purposes of this case, the Seventh Circuit held that

post-judgment interest should be calculated from the date of the amended judgment to be entered by the district court *after* remand. *Id.* As the Seventh Circuit explained, the district court had erred, both legally and factually, in determining the "reasonable" amount of attorney fees that should be awarded. *Id.* at 833–36. Thus, "neither the amount due for fees nor the due date of the obligation was authoritatively defined" until the new fee award was determined on appeal, meaning there would "be a final valid judgment only when a new one shall have been entered in conformity with [the Seventh Circuit's] mandate." *Id.*[2]

Just as in *Divane* and *Harris*, the Seventh Circuit held on appeal that this court had erred in calculating the award of punitive damages and directed reconsideration of its award on remand based on the appropriate legal and factual considerations. Similarly, the actual amount of the punitive damages award was, therefore, still not "meaningfully ascertainable" until this court complied with the Seventh Circuit's instruction on remand and entered an amended final judgment on July 12, 2022. Accordingly, post-judgment interest must accrue from that date.

---

[2] The court notes that the Seventh Circuit's decision in *Fleming v. County of Kane*, 898 F.2d 553 (1990), appears to conflict with its later decisions in *Divane* and *Harris*. In *Fleming*, the Seventh Circuit vacated and remanded an award of attorney fees with instructions that the district court explain why it chose plaintiff's calculations over defendant's. *Id.* at 564. However, the court of appeals also ordered that post-judgment interest would run from the date of the original attorney fee award. *Id.* at 565. That said, it appears no one argued in *Fleming* that post-judgment interest should run only from the date of the post-remand, amended judgment. Rather, the issue in *Fleming* was whether the district court had erred in awarding post-judgment interest from a date even *before* entry of the original judgment.

ORDER

IT IS ORDERED that:

(1) Plaintiff Epic Systems Corporation's motion for award of post-judgment interest (dkt. #1057) is GRANTED.

(2) Defendants must pay plaintiff post-judgment interest of $5,613,146.34.

Entered this 23rd day of September, 2024.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

EPIC SYSTEMS CORPORATION,

     Plaintiff,

    v.

                              Case No.  14-cv-748-wmc

TATA CONSULTANCY SERVICES LIMITED
and TATA AMERICA INTERNATIONAL
CORPORATION d/b/a TCA AMERICA,

     Defendants.

---

## AMENDED JUDGMENT IN A CIVIL CASE

---

IT IS ORDERED AND ADJUDGED that judgment is entered in favor of plaintiff Epic Systems Corporation against defendants Tata Consultancy Services Limited and Tata America International Corporation as to plaintiff's claims for breach of contract, violations of the Computer Fraud and Abuse Act, 19 U.S.C. § 1030(g) claims, violations of the Wisconsin Computer Crimes Act, Wis. Stat. § 943.70(2)(a), fraudulent misrepresentation, misappropriation of trade secrets, unfair competition, unjust enrichment and deprivation of property.

IT IS FURTHER ORDERED AND ADJUDGED that judgment is entered in favor of defendants Tata Consultancy Services Limited and Tata America International Corporation against plaintiff Epic Systems Corporation as to plaintiff's conversion claim.

IT IS FURTHER ORDERED AND ADJUDGED that judgment is entered in favor of plaintiff Epic Systems Corporation against defendants Tata Consultancy Services Limited and Tata America International Corporation dismissing defendants' counterclaims.

**A10**

Judgment in a Civil Case                                                                 Page 2

IT IS FURTHER ORDERED AND ADJUDGED that judgment is entered in favor of

plaintiff Epic Systems Corporation against Tata Consultancy Services Limited and Tata

America International Corporation in the amount of $280,000,000.00.


Approved as to form this 12th day of July, 2022.


_____
William M. Conley
District Judge


s/ R. Swanson, Deputy Clerk
_____          7/12/2022
Joel Turner                             _____
Clerk of Court                          Date

Judgment in a Civil Case                                                                 Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

EPIC SYSTEMS CORPORATION,

      Plaintiff,                                      JUDGMENT IN A CIVIL CASE

   v.                                                     Case No.   14-cv-748-wmc

TATA CONSULTANCY SERVICES LIMITED
and TATA AMERICA INTERNATIONAL
CORPOATION d/b/a TCA AMERICA,

      Defendants.

---

This action came for consideration before the court and a jury with District Judge William M. Conley presiding.  Partial judgment was granted by the court.  Other issues were tried to a jury, which rendered its verdict, and the court also entered injunctive relief. The court has now resolved all post-judgment issues and enters this judgment.

---

IT IS ORDERED AND ADJUDGED that judgment is entered in favor of plaintiff Epic Systems Corporation against defendants Tata Consultancy Services Limited and Tata America International Corporation as to plaintiff's claims for breach of contract, violations of the Computer Fraud and Abuse Act, 19 U.S.C. § 1030(g) claims, violations of the Wisconsin Computer Crimes Act, Wis. Stat. § 943.70(2)(a), fraudulent misrepresentation, misappropriation of trade secrets, unfair competition, unjust enrichment and deprivation of property.

IT IS FURTHER ORDERED AND ADJUDGED that judgment is entered in favor of defendants Tata Consultancy Services Limited and Tata America International Corporation against plaintiff Epic Systems Corporation as to plaintiff's conversion claim.

**A12**

IT IS FURTHER ORDERED AND ADJUDGED that judgment is entered in favor of plaintiff Epic Systems Corporation against defendants Tata Consultancy Services Limited and Tata America International Corporation dismissing defendants' counterclaims.

IT IS FURTHER ORDERED AND ADJUDGED that judgment is entered in favor of plaintiff Epic Systems Corporation against defendants Tata Consultancy Services Limited and Tata America International Corporation in the amount of $420,000,000.00.

IT IS FURTHER ORDERED AND ADJUDGED that judgment is entered in favor of plaintiff Epic Systems Corporation against defendants Tata Consultancy Services Limited and Tata America International Corporation, permanently enjoining defendants as follows:

1. This Permanent Injunction shall remain in full force and effect for four years from April 27, 2016, the date the effective date of the original Permanent Injunction.

2. For purposes of this Permanent Injunction, the following terms apply:
   a. "Epic" shall mean plaintiff Epic Systems Corporation.
   b. "TCS" shall mean Tata Consultancy Services Limited and Tata America International Corporation.
   c. "Trade Secret" shall mean the documents contained in Trial Exhibit No. 1247, limited to those documents (or portions of such documents) that are a trade secret as defined in the Wisconsin Uniform Trade Secrets Act, Wis. Stat. § 134.90(1)(c).
   d. "Confidential Information" shall mean the documents, including the content of the documents, contained in Trial Exhibit Nos. 2100 and 2101 that (i) are not trade secrets; and (ii) are "confidential information" as defined in the parties' Standard Consultant Agreement (Trial Ex. 3).

3. Except as expressly set forth in the opinion above, TCS and their respective affiliates, successors, officers, agents, servants, employees, and attorneys and any

and all other persons who are in active concert or participation with any of them (all collectively referred to as "Enjoined Parties"), are permanently enjoined, anywhere in the world, from the following:

   a. using any Epic Trade Secret or Confidential Information for any reason, including but not limited in the design, development, enhancement, or marketing of any TCS software providing solutions in the areas of electronic health records, electronic medical records, and hospital management systems, or any other healthcare software solutions, including but not limited to Med Mantra (as most broadly defined, including but not limited to, TCS-HIS, Med Mantra in use at Apollo Hospitals in India, British American Hospital in Mauritius, Tata Cancer Hospital in India, Tata Cancer Institute in India, and Med Mantra modules in development at DaVita Healthcare Partners, Inc. and Quest Diagnostics, Inc.) (collectively, "TCS EHR Products");

   b. possessing or retaining any Epic Trade Secret or Confidential Information in any form, including on any servers or other electronic computer systems of TCS or any other electronic or hard-copy media at TCS;

   c. accessing or attempting to access any non-public Epic servers or systems, including Epic' internet portal known as UserWeb; and

   d. permitting any TCS employee or consultant or agent who performed software testing on Epic's software in connection with TCS's work for Kaiser, directly supervised or managed such testing, or otherwise had access to any Epic Trade Secret or Confidential Information, including, but not limited to Naresh Yallapragada, Venugopal Reddy, and Madhavi Mukerji, to work on, or assist in, directly or indirectly, the design, development, enhancement, or marketing of any TCS EHR Products.

4. For the two years from April 27, 2016, unless extended by the court upon a showing of good cause, TCS shall not resist, hamper, delay, or otherwise interfere with the activities of a monitor to be appointed consistent with the procedure outlined in the above opinion. The monitor shall be paid by Epic and have unfettered access at any time, to monitor TCS's development and implementation of any TCS EHR Products to ensure that TCS does not improperly use any of Epic's Trade Secrets or Confidential Information, as described below. In particular, TCS shall permit the monitor to:

   a. Confirm that TCS employees, consultants, and agents do not have access to Epic's internet portal known as UserWeb or to any of Epic's Trade Secret or Confidential Information.

   b. Confirm that TCS does not possess or retain any Epic Trade Secret or Confidential Information on any of its servers, shared drives, shared domains, or other places of electronic information storage.

   c. Talk with any TCS employee who might be able to assist the monitor in determining whether Epic Trade Secret or Confidential Information was or is being used in the design, development, enhancement, or marketing of any TCS EHR Products. TCS shall provide the ombudsman or monitor with unfettered access to these TCS employees.

   d. Examine, evaluate, and analyze TCS's electronic information, including TCS's proxy logs, domain logs, active directory logs, software, servers, shared drives, and shared domains, to determine whether any Epic Trade Secret or Confidential Information was or is being used or is intended to be used in the design, development, enhancement, or marketing of any TCS EHR Products. TCS shall provide the monitor with unfettered access to this electronic information.

**A15**

5. Epic shall have the ability to confidentially provide the monitor with the type of information Epic deems necessary to monitor TCS's development and implementation of any TCS EHR Product to ensure that TCS does not improperly use any of Epic's Trade Secret or Confidential Information.

6. Except by leave of court, the monitor shall not disclose the substance or outcome of its ongoing investigation except for: (1) the procedures or tasks undertaken; and (2) specific evidence of a violation of the permanent injunction. To the extent the monitor may have only general evidence, he should disclose that evidence to the court, at which time the court will determine whether the monitor may disclose the evidence to Epic.

7. TCS shall provide written notice to all TCS employees who performed work for Kaiser Permanente and all employees who work (or worked during the relevant time period) on the design, development, enhancement, or marketing of any TCS EHR Products, that the Permanent Injunction has been issued and its terms.

8. Within 60 court days of the effective date of this Permanent Injunction, TCS shall file and serve a report in writing and under oath setting forth in detail the manner and form with which TCS has complied with the Permanent Injunction.

9. Violation of the Permanent Injunction shall be subject to all applicable penalties, including contempt of court and shifting the reasonable expenses that Epic has paid for the monitor to TCS.

10. This court shall retain continuing jurisdiction over Epic, TCS and the Enjoined Parties and the action for the purpose of enforcing or modifying the Permanent Injunction.

Approved as to form this **2nd** day of October, 2017.


William M. Conley
District Judge


Peter Oppeneer                          10/3/17
Peter Oppeneer                              Date
Clerk of Court

**A17**